IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS – EASTERN DIVISION

| | | |
|---|---|---|
| **PETRINA W.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| v. | ) **Case No.:** | FILED: JUNE 2, 2008 |
| | ) | 08CV3183        TG |
| **CITY OF CHICAGO PUBLIC** | ) **Judge** | JUDGE COAR |
| **SCHOOL DISTRICT 299, Local School** | ) | MAGISTRATE JUDGE COX |
| **District; CHICAGO OFFICE OF THE** | ) **Magistrate Judge** | |
| **BOARD OF EDUCATION, and** | ) | |
| **ILLINOIS STATE BOARD OF** | ) | |
| **EDUCATION,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## COMPLAINT

NOW COMES the Plaintiff, PETRINA W., by and through her attorneys, Equip for Equality, Inc. and Kirkland & Ellis LLP, and complains as follows:

## INTRODUCTION

1)    This action is brought under the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400 *et seq.* to timely appeal one aspect of an administrative ruling rendered by Impartial Hearing Officer Mary Schwartz ("IHO") on February 4, 2008. The IHO's Decision and Order followed a seven-day special education Due Process Hearing pursuant to the IDEA. (*See* Ex. A (2/4/08 Decision and Order))   This action is also brought under 20 U.S.C. § 1415(i)(3) for attorneys' fees and costs owed to the Plaintiff as the prevailing party in the underlying due process hearing against the Defendants.

2)      This case is a striking example of how Chicago Public School District 299 ("the District") failed miserably over many years to provide an appropriate education to a learning disabled student, failed to monitor the student's progress, and failed to appropriately tailor the student's Individualized Education Plan (IEP) to meet her unique needs.  Independent evaluations performed in 2007, when the student was 18 years old, showed that she "did not know the number of months in a year" and was unable to read words. (Ex. A at 16, 17)  One of her most recent teachers testified that, as of 2007, Petrina only "knew 70% of her letters and no short vowel sounds." (Ex. A at 23)   As another witness put it, the student's reading skills were "one of the worst, if not the worst, I have ever seen." (Ex. A at 22)

3)      Yet despite Petrina's lack of progress year after year in the special education system, the goals in her IEP were not appropriately modified and she did not receive needed services or teaching methods that could help her.  Furthermore, although the District tried to attribute her lack of progress to repeated absences, the District failed to address how her absences affected her learning or why the District failed to provide homebound services during any of the time Petrina missed school, as it should have.  As one District employee testified at the hearing, Petrina simply "may have slipped through the cracks." (Ex. A at 25)

4)      Based on the evidence, the Impartial Hearing Officer in this case rightly found that Petrina was denied a free appropriate public education ("FAPE") in at least six different ways from August 2005 to November 2007. (Ex. A at 20, 29)  The IHO determinations included that "the IEP goals developed during the relevant time period are not tailored to meet this student's unique needs" (*id.* at 22) and that "[c]leary, the IEPs offered to this student were failing her" (*id.* at 24).  In her current school placement at a private therapeutic day school (also referred to as a separate day school) for students with learning disabilities, Petrina is finally making

progress. However, the IHO failed to award Petrina a remedy for the District's failure to provide a FAPE for the last two years she attended a District school, erroneously finding that any award of compensatory education beyond the day before Petrina's 22nd birthday, on April 14, 2011, is not yet ripe. Petrina has already suffered her injury, and this issue is therefore ripe for decision now. A compensatory award of educational services beyond the date when her statutory right to educational services is set to expire, through at least the 2013-14 school year, is necessary to compensate her for her injury of not receiving a FAPE, and may properly be awarded under the law.

5)   This action is brought as an appeal of the IHO's Decision and Order, pursuant to the IDEA, 20 U.S.C. § 1415(i)(2).

**JURISDICTION AND VENUE**

6)   This Court has federal-question jurisdiction pursuant to 28 U.S.C. § 1331, and jurisdiction under the IDEA, 20 U.S.C. § 1415(i)(2)-(3), because this case is brought as a timely appeal of an Impartial Due Process Hearing, which took place pursuant to 20 U.S.C. § 1415(f). This Court also has jurisdiction pursuant to 20 U.S.C. § 1415(i)(3) and 105 ILCS § 5/14-8.02.

7)   Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because the acts complained of occurred in and the parties reside in or do business in the Northern District of Illinois.

**PARTIES**

8)   Plaintiff Petrina W. is a 19-year-old Chicago Public Schools student. The District identified Petrina as having a learning disability when she was 10 years old.

9) Defendant Chicago Public School District 299 is a school district located in the Northern District of Illinois, organized pursuant to the Illinois School Code. The District is responsible for ensuring that students with disabilities are provided a FAPE in the least restrictive environment. 20 U.S.C. § 1412(a)(1)(A).

10) Defendant Chicago Office of the Board of Education ("Board") is the decision-making body responsible for the District pursuant to 105 Ill. Comp. Stat. § 5/34-2. Along with the District CEO, the Board is also responsible for assuring that all students within its district who are eligible for services under the IDEA are provided a FAPE pursuant to state and federal laws.

11) Defendant Illinois State Board of Education is the administrative body that heard Petrinas Due Process Hearing, and it bears ultimate responsibility for providing a FAPE to Illlinois students with learning disabilities. 20 U.S.C. § 1412(a)(11). ISBE is also required to file the administrative record of the Due Process Hearing with the district court.

## FACTS

**A.     The District Discovers Petrina Has a Learning Disability in 1999.**

12) Petrina was first referred to the District's Intervention Assistance Team for individual supervision in 1998, when she was nine years old, because she did not know the alphabet or any pre-primer words. (Ex. A at 4) Her teacher reported that she needed individual supervision to complete any work, she was unable to spell basic words, and she could not remember letter sounds that had been previously identified for her. (*Id.*) From September 8, 1998, until October 22, 1998, Petrina received some services. But despite this, she showed no

improvement, and the team determined that she should be referred for a Case Study Evaluation. (*Id.*)

13) That evaluation, however, was not conducted until more than a year later. (*See id.*) In a subsequent meeting several months later, on March 17, 2000, the District determined that Petrina has a "learning disability" (*id.* at 5), which made her eligible for special education and related services under the IDEA, 20 U.S.C. § 1414. The IDEA requires that students with disabilities be provided with an Individualized Education Plan ("IEP") to ensure that they receive a free appropriate public education. Petrina's first IEP was established at the March 17, 2000 meeting. (*Id.*)

**B.     The District Fails to Provide Petrina a FAPE.**

14) Following Petrina's initial IEP eligibility meeting, the District held annual IEP meetings from 2000 to 2007. (*See id.* at 5-13) However, during that time Petrina showed little, if any, improvement, and her IEPs were never properly modified to address her lack of progress. (*See id.*)

15) Indeed, the IEPs were hardly modified at all from year to year—the only substantive changes made were to the number of minutes per week ("mpw") Petrina received in special education instruction and whether she received that instruction in a self-contained or regular classroom. (*See id.*) The IEPs never identified specific methodologies to help Petrina learn to read (*id.* at 22), nor did they address her attendance problems (*id.* at 25-26), which were due to her two pregnancies during high school as well as her embarrassment at being asked to read in front of her peers, who mocked her for her inability to do so. (*Id.* at 12, 15, 26)

Moreover, several of the IEPs contained wildly unrealistic goals that appeared not to take into account Petrina's learning disabilities at all.

16) For example, from 2000 to 2007 Petrina's highest reading and math evaluations were, respectively, at the third and fourth grade levels. Yet the district continued to increase her goals, suggesting among other things that she should "read and understand literature representative of various societies, eras and ideas," and that she should "use algebraic and analytical methods to identify and describe patterns." (Ex. A at 9 (record citation omitted)) The IEPs therefore were not at all tailored to her unique needs. Additionally, Petrina was evaluated in March 2003 by a psychologist, Dr. Jennifer Schwartz. (*Id.* at 6-7) Dr. Schwartz concluded that Petrina was "essentially a non-reader," and determined that she remained eligible for special education as a learning-disabled student. (*Id.* at 7) Nevertheless, the March 2003 IEP recommended the same special education program as before, and no assistive technology services were provided to her, nor any specific methodology recommended. (*Id.*)

17) The March 2006 IEP was no better. It noted, not for the first time, that Petrina was at a 1.7 grade level in reading and a 3.5 grade level in math. However, the March 2006 IEP was the first time that the District determined that Petrina required assistive technology to access the curriculum. (Ex. A at 9) Even so, Petrina was not evaluated for assistive technology until November 2007, more than a year and a half later. (*Id.* at 13) The District did not begin providing Petrina with assistive technology until after she had requested a Due Process Hearing and been placed at a private school better suited to her needs. (*Id.* at 23) Again, the March 2006 IEP included no methodology to help Petrina achieve her goals. (*Id.* at 9, 22)

18)     Despite Petrina's demonstrated lack of improvement throughout the seven years that the District had maintained an IEP for her, Petrina's IEPs were ***never*** modified to provide reading and math programs that met her needs. (*Id.* at 21-22) Nor did the IEPs even accurately report her progress. To the contrary, Petrina's IEP progress reports for the 2006-07 school year and for the first quarter of 2007 reported that she was completing assignments and meeting her benchmarks in all of her core subject areas. (*Id.* at 14, 23) This was despite the fact that, even with modified grading, she received C's, D's, and F's in her classes in 2006-07. (*Id.* at 14) She also received an "F" as a midterm grade in all subjects for the first quarter of the 2007-08 school year. (*Id.*)

19)     Following a May 2, 2007 IEP meeting, Petrina sought placement by the District in a private therapeutic day school. (*Id.* at 12) The District, however, did nothing in response to this request until Petrina filed a request for a due process hearing in August 2007, and Petrina did not begin classes at a private school until November 2007. (*Id.* at 4)

20)     Throughout the late-spring and summer of 2007, Petrina was evaluated by three independent specialists. (*Id.* at 15-18) Dr. Cheri Laaperi, Ph.D., performed a psycho-educational evaluation; Dr. Janet Marsden-Johnson, Ph.D., performed a speech and language evaluation; and Dr. Jeanane Ferre, Ph.D., performed a central auditory evaluation. (*Id.*) The independent evaluators concluded that:

    (a)     Petrina has a significant speech and language disorder, with deficits in listening, processing, memory, oral and written expression, and reading.

    (b)     She has significant deficits in auditory processing skills, vocabulary, syntax, and morphology, all of which hinder her academic progress.

7

    (c)    She has a central auditory processing disorder, which is a deficit in auditory decoding/discrimination skills.

    (d)    She is essentially a non-reader.

    (e)    She received *no* academic benefits during her time in the District.

21)    On August 2, 2007, Petrina filed a due process request seeking, among other things, compensatory education in the form of educational services beyond her 22nd birthday to compensate for her lack of an appropriate education. (Ex. A at 1)

22)    The District convened another IEP meeting on September 21, 2007, during which the IEP team agreed to placement in a separate day school due to Petrina's need for intense remediation in reading and math. (*Id.* at 12-13) However, the District offered to continue Petrina's placement in a separate day school only through the 2008-09 school year. (*Id.* at 13)

23)    Petrina filed a dissent to the September 21, 2007 IEP. (*Id.* at 13) In it, she requested compensatory education in the form of placement at a private school through the end of the 2013-14 school year. (*Id.*)

**C.    Petrina's Reading and Math Improve When She Begins Attending Acacia Academy.**

24)    On November 7, 2007, Petrina began classes at Acacia Academy, a private school for students with learning disabilities. (*Id.* at 4) Since starting at Acacia, Petrina's attendance and self-esteem have greatly improved, and she is making significant progress in her reading skills. When she began at Acacia, Petrina knew only about 70 percent of her letter sounds and did not know any short vowel sounds. (Ex. A at 23) After just one month, Petrina was able to identify all letter sounds and was beginning to read three-letter words. Petrina's teacher at

Acacia uses components of the Wilson program, a multi-sensory program, in her classroom, and the Wilson methods work for Petrina. (*See id.*) Neither this program nor anything similar was ever used with Petrina while she attended District schools.

### D.  The Due Process Hearing.

25)   The Due Process Hearing was held in December 2007 and January 2008. (*Id.* at 1-2)  The IHO issued a Decision and Order on February 4, 2008. (*Id.* at 32)

26)   Dr. Laaperi testified at the Hearing that the vast majority of the IEP goals set for Petrina were beyond her ability level because she could not read, write, or spell, and had math skills at the early elementary level.  Based on this testimony, the IHO concluded that "[i]f the student had no hope of accomplishing these goals, it follows that they could not have been written to address her individual needs." (Ex. A at 22)

27)   Dr. Laaperi also testified that the IEP goals did not address Petrina's need for a systematic phonics program to teach her how to read.  She said the IEP goals contained no reading methodology whatsoever.  Nor could any of the English/Language Arts teachers who testified articulate a systematic method that they had implemented to teach her to read. Dr. Laaperi testified that Petrina's reading skills were "one of the worst, if not the worst, I have ever seen." (Ex. A at 22 (internal quotation marks omitted))

28)   Dr. Laaperi also testified that Petrina should receive compensatory services from the District through at least the age of 25 in order to reach a sixth-grade reading level, and that Petrina should receive such services beyond age 25 if she has not yet reached a sixth-grade reading level at that point.  She testified that Petrina received ***no*** academic benefits from the District, and that Petrina did not learn to read, write, or do basic math during all her years in the

District.  Dr. Laaperi recommended that Petrina be placed in a small, supportive, multi-sensory classroom with individual attention at a private school for students with learning disabilities.  (*Id.* at 17)

29) Dr. Marsden-Johnson testified that because Petrina does not process auditory information well, she cannot understand most of what her teachers tell her.  (*Id.* at 18)  She testified that the District should have evaluated Petrina for assistive technology years ago, instead of waiting until the March 2006 IEP to recommend it, when Petrina was 18 years old.  Even then, Petrina did not actually receive assistive technology services until December 2007, after she began classes at Acacia.

30) Dr. Marsden-Johnson also testified that Petrina should have received speech/language services because she has a speech/language disability.  (*Id.* at 18)  The IHO determined that "[t]here is reliable evidence that the student's disabilities in reading, speech/language, and central auditory processing are not new and significantly interfered with her ability to learn.  How the student could have made progress when her IEP did not provide the services or program necessary to address all her disabilities has not been explained."  (Ex. A at 23)

31) Because Petrina tested at the lowest possible level in four of five areas Ms. Lopez, a school psychologist for the District, testified that she could not understand why Petrina's teachers reported that she was passing all her subjects.  (*Id.* at 27)  She testified that she talked to Petrina's teachers, and they reported that modified grading criteria were used for Petrina, and that she was a good student who was doing her homework.  (*Id.*)  But despite this testimony, the

10

IHO found that the District "had ample evidence in 2006 of the student's deficits," yet the District "never evaluated the student to determine the cause of these problems." (*Id.*)

32) Ms. Rezabek, an educational audiologist with the District, testified that a central auditory processing disorder should be suspected if a student is not learning to read. (Ex. A at 27) Yet the District has never conducted a central auditory processing evaluation of Petrina, and the District's first speech/language evaluation was done in 2007. (*Id.*)

33) Ms. Connor, one of Petrina's teachers at Acacia, testified that Petrina is "finally learning" and is "embracing the chance she's been given." Ms. Connor also testified that Petrina would benefit academically from compensatory education beyond her 22nd birthday.

E. **The IHO Properly Rejected the District's Defense That Petrina Did Not Attend School.**

34) The District argued at the Hearing that it did not have the opportunity to provide Petrina a FAPE because of her lack of attendance. (Ex. A at 25) Petrina missed a number of school days while attending Tilden High School because of her two pregnancies and because of her embarrassment at being asked to read at school. She testified that she never received homebound services during the periods surrounding the delivery of her two children. All of the District's witnesses testified that the student's attendance problems contributed to her lack of progress, yet they also testified that the IEP team never discussed her attendance issues or addressed them in an IEP. (*Id.*) Ms. B., a case manager, testified that she did not schedule a "staffing" when Petrina received failing grades in 2007 because that "was the teacher's job." (Ex. A at 25 (internal quotation marks omitted)) D.C., Tilden's attendance coordinator, testified that Petrina "may have slipped through the cracks." (*Id.*) D.C. also testified that she did not discuss any services that Tilden High School could offer Petrina because Petrina had refused to

11

sign an attendance contract at her re-enrollment meeting in February 2007. The IHO concluded that the District had not addressed Petrina's attendance issues through an IEP or through a behavioral intervention plan. (*See id.* at 26.)

35) Karen Wardlaw, Petrina's field probation officer, testified as a rebuttal witness at the Hearing. Ms. Wardlaw testified that Tilden High School actively prevented Petrina from re-enrolling prior to February 2007, following her second pregnancy, and that the February 2007 re-enrollment meeting was "the worst re-enrollment I have ever been at in my entire career." (Ex. A at 25 (internal quotation marks omitted)) Ms. Wardlaw listed a number of excuses offered by the Tilden staff for why Petrina could not re-enroll, including that her medical records were not up to date (Ms. Wardlaw later proved this was untrue) and that her IEP was not up to date (also untrue). (*Id.*) Ms. Wardlaw testified that the school told Petrina's father that he could be charged with educational neglect because of Petrina's absences. (*Id.*) Yet D.C., the attendance coordinator, testified that Tilden did not always even send parents a letter regarding their children's unexcused absences.

36) In addition, Ms. Wardlaw testified that, on her advice, Petrina had not signed the attendance contract offered by the school at the February 2007 re-enrollment meeting because it was undated and blank. (Ex. A at 25) The school staff refused to include anything regarding social work services or pregnancy services in the contract prior to Petrina's signing of the blank document. (*Id.*) To protect Petrina, Ms. Wardlaw advised her not to sign it, for fear that the District would back-date the contract and then say that she could not be re-enrolled because she had violated the contract. (*Id.* at 26)

**F.     The IHO'S Decision and Order.**

  37)     The IHO ruled that the District had denied Petrina a FAPE in at least six different ways. (Ex. A at 20-26)  Finding that Petrina was denied an appropriate education, the IHO correctly ordered that:

    (a)     The District was required to convene an IEP meeting with appropriate Acacia and District staff, to develop an IEP providing Petrina a list of specific services, including assistive technology services and devices, speech/language services with goals that incorporate the findings and recommendations in Dr. Marsden-Johnson's report, and aural rehabilitation therapy and central auditory processing goals; and

    (b)     The District was required to conduct an appropriate vocational assessment of Petrina and incorporate all findings and recommendations from that assessment into her IEP and transition plan. (Ex. A at 30)

  38)     The IHO ruled against Petrina on the following two issues, which are not being appealed:

    (a)     Petrina's request that the District pay for the three independent evaluations conducted in the spring and summer of 2007 by Drs. Laaperi, Marsden-Johnson, and Ferre was denied; and

    (b)     Petrina's request that the District pay for her to attend a pragmatic social interactions class was denied.  (Ex. A at 30)

39) The IHO's Decision and Order also granted Petrina placement in a private school, at the District's expense, through April 14, 2011, the day before Petrina's 22nd birthday. (Ex. A at 30)

40) However, because Petrina has a statutory right to a free appropriate education until the day before her 22nd birthday, this "award" addresses Petrina's need for a future FAPE, but does not constitute a remedy for Petrina's past deprivation. The IHO failed to grant an award of compensatory education—services beyond her 22nd birthday—because the IHO mistakenly believed the claim was not yet ripe. Petrina now appeals only the portion of the Decision and Order finding that her claim for services beyond her 22nd birthday is unripe.

## COUNT I

### THE LENGTH OF EDUCATION SERVICES AWARDED IN THE IHO'S DECISION AND ORDER IS CONTRARY TO THE MEANING AND INTENT OF THE IDEA, AND MUST BE OVERTURNED.

41) Plaintiff repeats and realleges paragraphs 1-40 and incorporates them herein by reference.

42) The portion of the IHO's Decision and Order addressing the length of the education award should be overturned because the IHO mistakenly found that any claim Petrina may have for compensatory education is not ripe until she turns 22. (Ex. A at 30) After finding that Petrina was denied an appropriate education, the IHO was authorized under the law to award compensatory educational services past the age of 22, and should have granted an award for services through the 2013-14 school year.

43) Petrina's claim for compensatory education is ripe. The injury has been done, and an award of compensatory education is appropriate. Petrina will suffer undue hardship if she is forced to wait until her 22nd birthday to bring a claim for compensatory education. In three years, the evidence of her claim could be stale, necessary witnesses may be unavailable, and the District likely would raise the statute of limitations as a bar to her claim. There is no reason why the IHO should not have issued an order awarding Petrina two years of compensatory education at this time.

WHEREFORE, the Plaintiff requests that this Court:

(a) Review the administrative record and the IHO's Decision and Order;

(b) Find that the portion of the Decision and Order holding that a claim for compensatory education is not ripe until the student reaches the age of entitlement violates the IDEA and order it to be reversed;

(c) Order that the District be required to pay for Petrina's education, at Acacia Academy or another suitable school, if one is later determined to be more appropriate to Petrina's needs, through the 2013-14 school year;

(d) Order any other relief as this Court deems just.

## COUNT II

**PETRINA IS ENTITLED TO ATTORNEYS' FEES AND COSTS AS THE PREVAILING PARTY IN THE UNDERLYING ADMINISTRATIVE PROCESS.**

44) Plaintiff repeats and realleges paragraphs 1-43 and incorporates them herein by reference.

45) On May 21, 2008, Petrina's attorneys made a claim for attorneys' fees to the District. The District was unable to advise if it would pay any or all of the claim for attorneys' fees before the filing deadline for this Complaint. (*See* Ex. B (Plaintiff's Attorneys' Fee Summary))

46) Petrina is the prevailing party in the underlying administrative proceeding against the District pursuant to 20 U.S.C. § 1415(i)(3)(B) and is therefore entitled to an award of reasonable attorneys' fees and costs.

47) The attorneys' fees are consistent with the rates prevailing for the kind of quality of services furnished, as required by 20 U.S.C. § 1415(i)(3)(B). Moreover, the fees are not unjust nor excessive.

WHEREFORE, the Plaintiff requests that this Court:

(a) Find that Petrina was the prevailing party in her administrative proceeding against the District pursuant to 20 U.S.C. § 1415(i)(3)(B);

(b) Award attorneys' fees and costs incurred in prevailing in the underlying administrative proceeding against the Defendants;

(c) Award attorneys' fees and costs for any portion of fees reduced due to the IHO's ruling on the compensatory education issue, in the event that this Complaint is successful;

(d) Award reasonable attorneys' fees and costs that are being incurred to prosecute this Complaint; and

(e) Order any other relief as this Court deems just.

DATED:   June 2, 2008  　　　　　　　　　　　　Respectfully submitted,


　　　　　　　　　　　　　　　　　　　　　　　/s/ *Katherine M. Swift*　　　　　　

　　　　　　　　　　　　　　　　　　　　　　　Jonathan E. Hinkemeyer (ARDC # 6256090)
　　　　　　　　　　　　　　　　　　　　　　　Charles G. Wentworth (ARDC # 6284238)
　　　　　　　　　　　　　　　　　　　　　　　Katherine M. Swift (ARDC # 6290878)
　　　　　　　　　　　　　　　　　　　　　　　Kirkland & Ellis LLP
　　　　　　　　　　　　　　　　　　　　　　　200 E. Randolph Drive
　　　　　　　　　　　　　　　　　　　　　　　Chicago, IL 60601-6636
　　　　　　　　　　　　　　　　　　　　　　　Tel: (312) 861-2000
　　　　　　　　　　　　　　　　　　　　　　　Fax: (312) 861-2200

　　　　　　　　　　　　　　　　　　　　　　　Olga Pribyl (ARDC # 6190672)
　　　　　　　　　　　　　　　　　　　　　　　Rachel Shapiro (ARDC # 6290735)
　　　　　　　　　　　　　　　　　　　　　　　Equip for Equality, Inc.
　　　　　　　　　　　　　　　　　　　　　　　20 N Michigan, Suite 300
　　　　　　　　　　　　　　　　　　　　　　　Chicago, IL 60602
　　　　　　　　　　　　　　　　　　　　　　　(312) 341-0022

　　　　　　　　　　　　　　　　　　　　　　　*Attorneys for Plaintiff Petrina W.*