## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS – EASTERN DIVISION

| | | |
|---|---|---|
| **PETRINA W.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No.:** 08cv3183 |
| | ) | |
| **CITY OF CHICAGO PUBLIC** | ) | **Judge Coar** |
| **SCHOOL DISTRICT 299, Local School** | ) | |
| **District; CHICAGO OFFICE OF THE** | ) | **Magistrate Judge Cox** |
| **BOARD OF EDUCATION, and** | ) | |
| **ILLINOIS STATE BOARD OF** | ) | |
| **EDUCATION,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## <u>NOTICE OF FILING OF EXHIBITS TO COMPLAINT</u>

NOW COMES the Plaintiff, PETRINA W., by and through her attorneys, Equip for

Equality, Inc. and Kirkland & Ellis LLP, and files the following two exhibits to her Complaint:

1.     Exhibit A, Illinois State Board of Education Hearing Officer's Due Process Decision and Order, 2/4/08

2.     Exhibit B, Detailed Time Record for 2007-1431.

DATED:   June 4, 2008                          Respectfully submitted,


                                               /s/ *Katherine M. Swift*

                                               Jonathan E. Hinkemeyer (ARDC # 6256090)
                                               Charles G. Wentworth (ARDC # 6284238)
                                               Katherine M. Swift (ARDC # 6290878)
                                               Kirkland & Ellis LLP
                                               200 E. Randolph Drive
                                               Chicago, IL 60601-6636
                                               Tel: (312) 861-2000
                                               Fax: (312) 861-2200

                                               Olga Pribyl (ARDC # 6190672)
                                               Rachel Shapiro (ARDC # 6290735)
                                               Equip for Equality, Inc.
                                               20 N Michigan, Suite 300
                                               Chicago, IL 60602
                                               (312) 341-0022

                                               *Attorneys for Plaintiff Petrina W.*

Ex. A

# ILLINOIS STATE BOARD OF EDUCATION
## IMPARTIAL DUE PROCESS HEARING

PETRINA W████  )
Student,  )
 )
 )
 )  ████████████
CITY OF CHICAGO PUBLIC  )
SCHOOL DISTRICT 299,  ) MARY SCHWARTZ
Local School District.  ) Due Process Hearing Officer
 )

## DECISION AND ORDER

### Jurisdiction

  This matter is before the undersigned hearing officer on the student's request for a due process hearing. This hearing officer has jurisdiction pursuant to the Individuals with Disabilities Education Improvement Act ("IDEA"), 20 U.S.C. § 1400 *et. seq.*, 105 ILCS 5/14-8.02a *et. seq.*, and 23 Il. Adm. Code § 226.600 *et. seq.* The parties have been fully advised of their rights pursuant to these statutes and regulations.

### Procedural Background

  The student, through her attorney Equip for Equality, filed a due process request on August 2, 2007. The district received the student's request on August 6, 2007, and forwarded it to the Illinois State Board of Education ("ISBE"). The ISBE appointed the undersigned as hearing officer on August 13, 2007, via appointment letter. The undersigned sent the parties a preliminary scheduling order on August 14th and attempted to contact the parties by telephone. The district filed its response to the student's due process request on August 15, 2007.

  The hearing officer held an initial telephone status conference call on September 10, 2007. During that call, the parties informed the undersigned that they had participated in mediation on September 7th but were unable to resolve their differences. The parties did, however, agree to convene an IEP meeting on September 21st. The hearing officer set the pre-hearing conference for September 18th. The pre-hearing conference was held as scheduled. The hearing officer issued a pre-hearing conference report on September 19th. Since that report provides comprehensive details of what transpired at the pre-hearing, the conference details are not reviewed here.

  On September 26, 2007, the district filed a Motion to Strike Remedies ("Motion"), requesting that the undersigned dismiss the student's request for reimbursement of independent educational evaluations ("IEE"). The student's Response, filed October 2nd, asserted that her right to request an IEE had been triggered and asked that the district's motion be denied. On October 11th, the undersigned denied the district's Motion, finding that substantial questions of law and fact existed, which could only be resolved through a hearing, and that the district would not be prejudiced by denying the motion. On November 28th, via letter to the hearing officer, the student requested a transcript of the hearing.

  On October 1st, the hearing officer set the hearing for December 3, 4, 6, and 7, 2007, the first dates on which the parties and hearing officer were available. Because of extensive witness testimony, the hearing did not conclude on December 7th. The parties filed a joint request to extend the hearing's completion beyond the 30 days between the first and last day of the hearing imposed

Case: 05-cv-02183   Document 72    Filed 06/04/2008   Page 3 of 33 As the student had started at her new, agreed-upon placement in November 2007 and thus her educational placement would not be affected by this delay, the hearing officer granted the joint request. In January, after two additional hearing days, the parties requested a third day for the testimony of the district's final witness and closing arguments. The hearing concluded on January 25, 2008.

On December 5th, the student made a request to the district for a transcript of the first four days of the hearing. The district informed the student that the transcript would be ordered after the hearing had concluded. The student, on December 20th, filed a motion to receive a transcript within 30 days of her transcript request. The district filed a response asking the hearing officer to deny the student's motion and order that a transcript would be provided within 30 days of the hearing's conclusion. On January 8, 2008, the undersigned issued an order granting the student's request for a transcript of the December proceedings, with the remainder to be provided within 30 days of the hearing's conclusion. Despite the January 8th order, no transcript was issued prior to the issuance of this decision. Therefore, the testimony reviewed in this decision is based solely on the undersigned's notes and memory of what transpired at the hearing.

This hearing officer has read all the documents presented at the hearing and entered into evidence at the hearing's conclusion. Those documents are part of the record of this hearing, as are the parties' written closing arguments, case law provided to the hearing officer at the close of the hearing, and the entire case file of documents maintained by the hearing during the course of this proceeding. This decision is being issued within ten days after the hearing's conclusion, as required by Illinois law. 105 ILCS 5/14-8.02a(g55)(5).

Toomey Reporting provided court reporters throughout the hearing.

## Issues Presented and Remedies Sought

The student alleges that the district has denied her a free appropriate public education ("FAPE") since August 2, 2005, by:

1. failing to change her special education services or placement until September 21, 2007, and failing to start her new placement at Acacia Academy until November 7, 2007, despite the fact that the student made little to no progress from August 2, 2005, to the time she began at Acacia;

2. failing to appropriately evaluate the student in 2006 by not addressing the student's cognitive ability, oral language, listening and speaking ability, auditory processing, visual processing, visual-motor processing, timed reading, writing, and math skills, the failure of which led to inappropriate special education services;

3. failing to provide a peer reviewed research-based program that was individualized to meet the student's needs;

4. failing to provide specific present levels of performance ("PLOP") and measurable goals for the student in each of her IEPs since August 2, 2005;

5. failing to create appropriate IEP goals, based on the student's unique areas of need related to her disability, or to modify inappropriate IEP goals for the student, since August 2, 2005;

6. failing to refer the student for assistive technology ("AT") prior to 2007 and failing to provide her with AT from August 2, 2005, to the present; and,

7. leading the student and her family to believe that she was meeting her IEP goals by making statements such as "(student) is meeting her goal/benchmarks" in biology, algebra, and world studies, in a June 14, 2006, High School Report of Student Progress.

2

As remedies for the above alleged violations, the student requests that:

1. the district pay for the student's individual educational evaluation by Dr. Jeanane Ferre due to the district's failure to identify and meet the student's needs when the Juvenile Court Probation Department brought those needs to light at the May 2007 IEP meetings and when some of those needs were evident at earlier meetings;

2. the district pay for the student's individual educational evaluation by Dr. Janet Marsden-Johnson due to the district's failure to identify and meet the student's needs when the Juvenile Court Probation Department brought those needs to light at the May 2007 IEP meetings and when some of those needs were evident at earlier meetings;

3. the district pay for the student's individual educational evaluation by Learning Diagnostics due to the district's failure to identify and meet the student's needs when the Juvenile Court Probation Department brought those needs to light at the May 2007 IEP meetings and when some of those needs were evident at earlier meetings;

4. the district pay for an independent AT evaluation to determine the student's need for AT to help her learn how to read, spell, write and calculate;

5. the district pay for the student to attend the pragmatic social interactions classes offered by the Center for Speech and Language Disorders, to aid her with daily living and social skills for one year, including transportation to and from these classes;

6. that the district fund the student through academic year 2013-14 at a private educational placement focusing on learning disabilities or vocational skills, to be determined by the student and her parents in conjunction with the district, as compensatory education services to compensate the student for the loss of appropriate education;

7. the district pay for an independent vocational evaluation and pay for appropriate vocational training courses; and,

8. any additional relief deemed appropriate by the hearing officer.

The district argues that it has provided a free appropriate public education to the student. Moreover, by way of an affirmative defense, the district argues that the student's non-attendance for significant amounts of time contributed to her alleged lack of academic progress.

## Burden of Proof

In an administrative hearing, the party seeking relief bears the burden of proof. *Schaffer v. Weast*, 126 S. Ct. 528, 539 (2005). Therefore, in this matter the student has the burden of proof as she filed the due process complaint. Under Illinois law, the school district must provide evidence that it has appropriately identified the student's educational needs and that the special education and related services are adequate, appropriate, and available. 105 ILCS §14-8.02a(g). This statutory provision requires the district to produce evidence but does not shift the burden of proof to the district. *Kerry M. v. Manhattan Sch. Dist. #14*, 106 LRP 5847 (N.D. Ill. 2006).

## Stipulations by the District During the Hearing

The district made the following stipulations during the hearing:

1. Every student record contained in (student's) special education and student files were provided to Equip for Equality.

2. CPS admits all student records in Student Documents relating to (student's) school record. Specifically, the district stipulates admittance of records from pages 159-403 and

3

3. No speech services or speech evaluation were provided prior to September 2007.

## Findings of Fact[1]

The student's disabling condition is not at issue: the parties agree that she is eligible for special education and related services as a learning disabled student. The parties agreed to place the student at Acacia Academy at an IEP meeting held on September 21, 2007. (SD 18, PW 176). She began at Acacia on November 7, 2007(PW ).

The student, whose birth date is April 15, 1989, is currently 18 years 9 months old. She has two children, whose birthdates are September 19, 2005, and September 28, 2006. (Student testimony).

## A. Student's Education Prior to IDEA Eligibility

The student began in the Chicago Public School ("CPS") system in pre-school. (PW147). In the fall of 1998, when she was nine years old, she was referred to the Intervention Assistance Team because she did not know "the alphabet or any pre-primer dolch list words." (PW154). Her classroom teacher reported that the student needed individual supervision to complete any work, was unable to spell basic words, and could not remember letter sounds that had been previously been identified for her. The teacher also reported that when the student was asked to read aloud or do a math problem on the board, she would "cry, thrash her arms around (and) insists that she go home." (PW 155). Between September 8, 1998, and October 22, 1998, the student received intervention pull-out services for math and reading for 40 minutes per day per subject and 1:1 assistance within her classroom twice a week for 40 minutes. Despite these services, she showed no improvement. The team thus determined that the student should be referred for a Case Study Evaluation ("CSE"). (PW 157). There is no documentation showing that a CSE was conducted in school year 1998-99.

## B. Initial Case Study Evaluation and IEP Eligibility Meeting

Over a year later, on December 10, 1999, the student was again referred for a CSE. The referral states that she had been retained in third grade and that, although she had made an effort at the beginning of the school year, her efforts decreased over the year as the work became more difficult. The referral also notes that the student's "belligerent behavior" was "a cover for her academic deficiencies." (PW 143-144).

The CSE consisted of a psychological evaluation of the student's general cognitive functioning, achievement levels, and visual-motor integration. On the Kaufman Assessment Battery for Children (K-ABC), the student's general cognitive functioning was in the borderline to slow range. However, her sequential processing score was within the average range. On the Bender-Gestalt Test of Visual-Motor Integration, she achieved an age equivalency score of 5-2 to 5-3. Short-term auditory/visual memory was identified as a strength. On the K-ABC Achievement test,

---

1   The student's documents are cited as PW followed by a page number; the district's documents are cited as SD followed by a page number. As some of the documents in both parties' document binders were not entered into evidence at the end of the hearing, some of the page numbers do not follow sequentially. This hearing officer has inserted a complete list of all documents entered into evidence by each party at the front of each party's document binder. The hearing officer's documents are referenced as IHO and a tab number.

the student's overall achievement was at the <0.1 percentile. Her reading/decoding skills were at a <1.0 grade equivalent. She was unable to identify letters in isolation or to complete any of the comprehension items. In math, the student scored as a 1.6 grade equivalent. The evaluator identified short-term auditory and visual memory as strengths for the student. The school psychologist recommended individualized instruction in a small classroom setting. (PW 139-141).

The district held an initial eligibility and IEP meeting on March 17, 2000. It appears that the parents did not attend as neither of them signed the IEP. (PW 364). The IEP lists both her language arts and math present levels of performance ("PLOP") as at the first grade level in reading and math and states that in 1999, she had scored 2.7 in reading and 1.5 in math on the district's 1999 ITBS test. (PW 364-367). The proposed special education program included 650 minutes per week ("mpw") of language arts instruction and 350 mpw of math instruction in a special education classroom. (PW 368). The IEP also states that the student was to be provided with compensatory education in the form of four weeks of Extended School Year ("ESY") services because a self-contained placement was not available. (PW 370). An IEP amendment was also created on March 17th reducing the student's special education minutes from 1000 mpw to 400 mpw because of the lack of a self-contained classroom. (PW 374).

## C. December 11, 2000 IEP Meeting

The first annual IEP review meeting was held on December 11, 2000. There is no documentation that either of the student's parents attended the meeting. (PW 353). The team recommended a special education program consisting of 650 mpw of language arts instruction and 350 mpw of math instruction in a special education classroom and four weeks of ESY. (PW357). The language arts goal states that the student's PLOP in reading was at the 3.4 level per her Spring 2000 ITBS score. (PW 355). The IEP includes two language arts goals: first, the student will be able "to identify connotative and demotative [sic] meanings of words" and "be knowledgeable of homonyms, antonyms, synonyms, homophones and homonagraphs," and second, she will be able to "logically and sequentially order story events, organize information sequentially…to alphabetize to the 3rd letter…(and) to determine cause effect relationships." (PW 355). In math, the student's PLOP is listed as 2.7, per her spring 2000 ITBS scores. The IEP provides two math goals: first, "to count, read, write and order whole numbers to 100,000, and identify the value of each digit; read and write number words to 100; (p)ut a series in sequentially order based upon quantity" and second, to "tell time to the quarter of an hour, make correct change from a $20 bill and (r)epresent money correctly" using the symbols for cent and dollar. (PW 356). As to standardized testing, the IEP provides that the student will "be allowed to take a lower level of the standardized test." (PW 358).

## D. December 21, 2001 IEP Meeting

The next IEP meeting was convened on December 21, 2001. There is no indication that a parent attended the meeting. (PW 344). The student's special education instruction was increased to 500 mpw language arts, 340 mpw math, 200 mpw social studies, and 200 mpw science, all in a separate classroom. ESY was maintained at four weeks. (PW 349). The IEP notes that the student is "creative" and "good at math." (PW 345). In language arts, the student's PLOP states that, according to the 2001 ITBS, she is at a 1.4 reading level. Her goal is to "be able to recognize words on the 1st & 2nd grade level. She will be able to read short sentences." Benchmarks require increasing levels of achievement, from 60% to 75%. (PW 346). The math PLOP reports the student's math score was 1.8 on the 2001 ITBS. Her math goal is to "be able to add 3 digit numbers with accuracy. She will also be able to subtract 2 digits and borrow with accuracy." The benchmarks require increasing levels of success. (PW 346).

5

## E. December 19, 2002 IEP Meeting

On December 19, 2002, the IEP team convened a second annual review. The parent was invited but did not attend. (PW 329). In language arts, the PLOP reports that the student was achieving at a high second grade reading level. It also notes that she needs small group instruction and weekly review of vocabulary and sight words, and reacts negatively in large groups. The language arts goal is for the student to read with understanding and fluency and to increase her reading skills from "P.R 1 on level 8 to P.R 2 on level 9." Quarterly benchmarks require that she "will be able to use decoding skills to increase her sight vocabulary, use phonics skills to locate information quickly by skimming and scanning, and use correct punctuation, capitalization and spelling in written work." (PW 334). In math, the PLOP reports that the student was performing at the fourth grade level and was able to perform basic math functions but required help with factoring and working with fractions. Her annual goal called for her to "continue to gain vocabulary and skills needed to perform arithmetic operations, patterns, ratios, proportions, decimals and percents." (PW 335). Her special education instructional minutes in language arts were decreased to 440 mpw and, in math, increased to 400 mpw.  Social studies and science remained at 200 mpw.  She was in a self-contained classroom. (PW 338). The IEP states that no AT is required. (PW 333).

## F. 2003 Revaluation and March 13, 2003 IEP Meeting

The district conducted a three year re-evaluation in 2003. The student was 13-10 years old at the time of the evaluation. (PW 125). She was in a 7th grade self-contained classroom. (PW 129). The school psychologist, Dr. Jennifer Schwartz, assessed the student's cognitive functioning, visual-motor integration, achievement, and adaptive functioning.

On the Stanford-Binet Intelligence Scale, 4th Ed., the student's standard scores ("SS") in verbal reasoning subtests were 28 in vocabulary, 33 in comprehension, and 78 in verbal reasoning, resulting in a test composite of 61. In abstract/visual reasoning, she received standard scores of 39 in pattern analysis and in matrices, and 75 in abstract/visual reasoning. Her standard scores in the quantitative reasoning subtests were 32 in both quantitative and number series and 64 in quantitative reasoning. On the short-term memory subtests, her standard scores were 31 in bead memory, 40 in both memory for sentences and memory for digits, and 68 in short-term memory. Based on these scores, Dr. Schwartz concluded that the student's overall cognitive functioning level was in the cognitively delayed range, with a standard score of 61. She reported that the student 's strengths were in auditory memory and abstract/visual reasoning, and her weaknesses in verbal reasoning, quantitative reasoning, short-term memory, and visual memory. (PW126-127).

On the Developmental Test of Visual-Motor Integration, the student received a standard score of 70, which placed her at the 2nd percentile. (PW 127). On the Draw-A-Person, the student scored at the 50th percentile, with an age equivalency of 11-0. (PW 127).

The student was given the Kaufman Test of Educational Achievement (KTEA) to assess her academic achievement. She scored at <1st percentile in all the subtests, which included math applications, reading decoding, spelling, reading comprehension, and math computation. Additionally, her composite scores in reading and math were at <1st percentile. She had a very poor sight-word base and was unable to sound out unknown words. She did not know many of the sounds associated with letters and had a poor knowledge of vowel sounds. Her spelling was below the 1st grade level. In math, she was achieving at an early 1st grade level. She showed weak word-problem solving skills and did not understand place values. She was unable to set up problems with a paper and pencil and unable to subtract with regrouping. (PW 127-128).

On the Vineland Adaptive Behavior Scales – Survey Edition, the student scored at <1st percentile in communication. Dr. Schwartz reported that the student's score was so low because she could not read, write, or tell time. The student scored significantly better in daily living skills, where she was at the 27th percentile and in socialization, where she scored at the 42nd percentile. The student's adaptive behavior composite score was at the 9th percentile. (PW 128-129).

Dr. Schwartz concluded that although the student's overall cognitive functioning was in the cognitively delayed range, she had a significant strength in abstract/visual reasoning. Both her auditory short-term memory and her visual memory were delayed.   She was "essentially a non-reader." Based on this evaluation, the school psychologist determined that the student remained eligible for special education as a learning disabled student. (PW 129).

An IEP was held on March 13, 2003, to review the triennial re-evaluation. The student's father attended the meeting. (PW 310). The team noted no adverse impact of communication, social/emotional, or motor abilities. (PW 312). The proposed educational program included 1240 mpw of special education in a separate class, divided into 440 mpw in language arts, 400 mpw in math, and 200 mpw in social studies and in science. (PW 322). Additionally, she was to receive four weeks of ESY. (PW 316). A modified grading criteria of "75% passing grade" was to be applied to the core subject areas. (PW 325). AT was not required. (PW 317).

The language goal reports the student's PLOP was at the 3rd percentile on level 8 of the 2002 ITBS and that she was working at the second/third grade level. The goal is for her to be able to "read with fluency and understanding." Quarterly benchmarks include identifying short and long vowels, consonants and "r" and "y" blends, and Dolch words. (PW 313). In math, the PLOP states that the student was "working on adding and subtracting fractions" and was in the 1st percentile on level 8 of the 2002 ITBS. The student's annual goal is to "demonstrate a knowledge and sense of numbers, arithmetic operations and number patterns." The goal is to be achieved through the following benchmarks:  "add, subtract, multiply, and divide whole numbers and decimals," "use least common multiples and greatest common factors in solving problems," and "use geometric methods to analyze, categorize and draw conclusions." (PW 319). In social studies, the PLOP states that the student is "working on mapping skills, vocab and identifying states and capitals." Her annual goal is to "understand and compare political systems w/emphasis on local, st. and fed government in the U.S." Benchmarks are to identify all the states and their capitals, to identify and analyze the role and function of the three branches of government, and to compare and contrast the powers and rights in the state constitution with those in the federal Constitution. (PW 320). The student's science PLOP states that she is "working on vocabulary and general knowledge necessary to conduct the scientific process." Her annual science goal is to have a "working knowledge of the scientific process and apply them to experiments." Quarterly benchmarks require her to "explain relationship among theories, hypotheses, experiments and data," "read, write, describe and discuss science related careers in the world around us," and "conduct a variety of investigations, construct models, observe and describe objects." (PW 321).

G. January 29, 2004 IEP Meeting

The student's IEP was reviewed again on January 29, 2004. The parents did not attend the meeting. (PW 285). The student's special education instructional program was continued at 1240 mpw. (PW 298). No ESY was required. (PW 288). The IEP states that the student was to have "no more than 20 days absent." (PW 301). The student's language arts PLOP reports that she is at the 2nd to 3rd grade level. The language arts goal calls for her to "read with fluency and understanding... Student will write to communicate for a variety of purposes and will listen and

7

speak effectively in a variety of situations at instructional level." The benchmarks developed to help the student' achieve this goal include "identify short and long vowel sounds," "continue to review dolch 3rd grade sight words and…concentrate on phonetic awareness, word origins and language patterns to comprehend texts," and to "review dolch 3rd grade sight works and use words in sentences… write to communicate for a variety of purposes." (PW 290). The math goal identifies the student's PLOP as at the "2nd to 3rd grade instructional level." The math goal is for the student to "demonstrate a knowledge and sense of numbers, arithmetic operations, and number patterns at the instructional level." The quarterly benchmarks are to "review basic arithmetic operations concentrating on addition, subtraction, multiplication including decimals and fractions at instructional level," "continue to review basic arithmetic operations and will begin to explore least common multiple and greatest common fact or at instructional level," and "continue to review basic arithmetic operations and will apply knowledge and a sense of numbers to geometric situations at instructional level." (PW 291). In social studies, the PLOP states that the student "does not [sic] a working knowledge of the political, economic, geographical, historical, or social systems of the United States of America." Her annual goal is to "have an understanding of the political economical, geographical, historical, and social systems with an emphasis on local, state, and federal government in the United States at instructional level." This student is to achieve this goal through the following benchmarks: "explore the fifty states and their capitals as well as historical significance attributed to said states and capitals," "analyze the role and function of local, state, and federal government in the United States comparing and contrasting them at instructional level," and "continue to compare and contrast government at local, state, and federal levels and will understand how economic and social forces influence history of government at instructional level." (PW 292). In science, the student's PLOP states that she is "currently working on vocabulary and general knowledge necessary to conduct the scientific process." By the end of the academic year, she is to "have a working knowledge of the scientific process and will apply said knowledge to experiments at instructional level." To help her accomplish this, the team developed the following benchmarks: "explain relationship among theories, hypothesis, experiments and data at instructional level," "read, write, describe, and discuss science related material historically as well as currently significant at instructional level," and "conduct a variety of investigations, construct models, observe and describe objects at instructional level." (PW 293).

## H. March 9, 2004 IEP Meeting

The January 29th IEP was revised on March 9, 2004. The parents did not attend the IEP revision meeting. (PW 280). The IEP team changed the student's placement from an instructional program to a resource program. (PW 281). This change of placement reduced her special education minutes from 1240 mpw to 400 mpw, divided into 200 mpw in language arts and 200 mpw in math. (PW 282). This decision was based on a determination that the student would "benefit from services in regular education." (PW 283). No goals are included in the IEP revision.

## I. March 9, 2005 IEP Meeting

The next IEP meeting was held on March 9, 2005. The student's parent participated by telephone. (SD 119; PW 264). Her placement was again changed, this time to include 230 mpw of language arts instruction and 230 mpw of math instruction in a separate class, and 230 mpw of science and 230 mpw of social studies instruction in a regular education class. (SD 127; PW 272). ESY is required for seven weeks. (SD 122; PW 267). The document indicates that the student is to use a calculator. (SD 123; PW 268). A modified grading scale is to be used. (SD 130; PW 275). The student's math, science and social studies PLOPs all state that she is "below grade level of expectancy. Reading at (blank) Grade level math at (blank) Grade level." The math goal is to "use geometric methods to analyze categorize and draw conclusions about points, lines, planes and

space." The math benchmarks are to "construct two and three dimensional geometric figures including prisms, pyramids, cylinders and cones," "construct a model of a three dimensional figure from a two dimensional pattern," and analyze and solve problems involving triangles (eg) distance which cannot be measured directly using trigonometric ratios." (PW 269). The student's science goal is to "understand the relationship among science, technology and society in historical and contemporary." Benchmarks call for the student to "identify advantages and disadvantages of natural resource conservations and management programs," "explain how peer review helps to assure the accurate use of data and improves the scientific process," and "demonstrate ways to avoid injury when conducting science activities." (PW 270). The social studies goal is to "understand events, trends, individual and moments shaping the history of Illinois, the United States and other nations." The goal's benchmarks include "identify the orgins [sic] and analyze consequences of events that have shaped world social history including families, migrations, plagues, slave trading," "describe how migration has altered the world's environment since 1450," and "describe the cause and effects of conservations and environmental movements in the United States since 1900 to present." (PW 271). The IEP has no language arts or reading goal.

The IEP team also developed the student's first transition plan. The plan indicates that the student's post-school outcome is "college prep." The plan identifies the student's PLOP as "read and math on 3rd grade level; no physical concerns; no work history; trade school an interest." The student's post-school education goal is to enter college in the medical field, and her post-school employment goal is to work at a medical center. (PW 277).

J. March 8, 2006 IEP Meeting

The IEP team held an annual review and transition planning meeting on March 8, 2006. Both the student and her mother attended the meeting. (SD 100; PW 244). The student had taken the Monroe Sherman prior to the meeting and on that assessment, her reading level was 1.7 and math level was 3.5. She also took a Work Interest Inventory Assessment, which reported that she is interested in caring for and helping others. (SD 101; PW245). The IEP notes, for the first time, that the student requires assistive technology ("AT") to access the curriculum. (SD 104;PW 248). The student's IEP changed her placement to 940 mpw of special education instruction within a self-contained classroom, divided into 230 mpw in each of the core subjects - English, math, science, and social science. (SD 110; PW 254). The student was to be graded using modified criteria in all core subject areas and to have a reduced work load and off-level assignments. She was to attend seven weeks of ESY. (SD; PW 257).

The student's English/language arts PLOP is "functioning below grade level with deficits in reading comprehension and fluency." The annual English goal is to "read with understanding and fluency" and to "read and understand literature representative of various societies, eras and ideas." English benchmarks include "expand knowledge of word origins and derivations….and make generalizations from content at instructional level," "explain relationships between and among literary elements including character, plot, setting, theme, conflict, and resolution at instructional level," and "analyze form, content, purpose and major themes of American Literature. Discuss and evaluate motive, resulting behavior and consequences demonstrated in literature at instructional level." (PW 251). In math, the PLOP states that the student is "currently functioning below grade level with deficits in recall and computation." The annual goal calls for her to "demonstrate and apply knowledge and sense of numbers including numeration and operations. Student will use algebraic and analytical methods to identify and describe patterns." The quarterly benchmarks are to "identify and apply the associative, commutative, distributive, and identify properties of real numbers at instructional level," "use algebraic methods to convert repeating decimals to fractions" and use the "basic functions of absolute value and square root at instructional level," and

9

and inequalities at instructional level." (PW 250). In social science, the student's PLOP is identified as "currently functioning below grade level." Her annual goal is to "understand political systems with an emphasis on the United States." Benchmarks require her to "analyze how local, state and national governments serve the purpose for which they were created," "describe the meaning of participatory citizenship at all levels of government and society in the United States," and "compare the political systems of the Untied States to other nations," all at the instructional level. (PW 252). The science PLOP is identical to that for social sciences. The student's science goal is to "understand the fundamental concepts, principles and interconnections of the life physical and earth/space sciences." Benchmarks include "explain how genetic combinations produce visible effects and variations among physical features and cellular function of organisms," " describe the structures and organizations of cells and tissues that underlie basic life," and "compare physical ecological and behavioral factors that influence interactions and interdependence of organisms," all at the instructional level. (PW 253).

The student's transition plan lists trade school program as a successful post-school outcome. On the transition plan, her PLOP is 'functioning below grade level. Her work interest inventory revealed that she is interested in caring and helping others." Her post-school education goal states that she "wants to enroll in an area college program to become a doctor or work in the medical field with children." (PW 259).

K. 2006 Re-evaluation and May 5, 2006 IEP Meeting

The district conducted a second triennial re-evaluation in May 2006. The student was 17 years old and in the ninth grade. (PW 122). Ms. Lopez, the school psychologist, administered the Kaufman Assessment Battery for Children 2nd Ed. (K-ABC) and reviewed the student's prior psychological evaluations and school records. (PW 119). On the K-ABC, the student scored at <0.1 percentile in letter and word recognition, reading comprehension, spelling, and reading composite. Her math computation score was at the 1st percentile. Based on these scores, Ms. Lopez concluded that the student was eligible for learning disabilities services. (PW122).

An IEP meeting was held on May 5, 2006, to review the re-evaluation. Neither the student nor her parents attended the IEP meeting. (SD 73; PW 222). The IEP states that the student has no "adverse social emotional concerns." (SD 75; PW 221). No change was made to the student's placement of 920 mpw in a special education classroom. (SD 89; PW 237). All the PLOPs, goals and benchmarks are the same as those on the March 8, 2006, IEP. (PW 233-236). (PW 234-236). ESY is required for seven weeks. (SD 81; PW 230). AT is again noted as a need, indicating that the student is to use a calculator in math and science. (SD 82; PW 231). The grading scale is to be modified for the student so that A is 90-100, B is 80-89, C is 70-79, and D is 60-69. The student is to be tested with the special education teacher and to have additional time for class assignments and exams. Modifications include testing one concept a\t a time, providing verbal directions with written examples and clearly stated steps, and reading directions in clearly stated steps. (SD 83; PW 232).

L. February 14, 2007 IEP Re-enrollment Meeting

A re-enrollment IEP meeting was held on February 14, 2007. The student, her parent, and the student's Probation Officer attended the meeting. (SD 70; PW 218). The IEP document is one page: the Identifying Information page. (SD 70; PW 218). Attached to the district's February 14th IEP is a handwritten conference note, also dated February 14, 2007. The note is signed by the assistant principal, the student, and her father. It states: "Recommendation: (Student) will re-enroll

02-14-07. A reminder was given that this is a uniform school." (SD 71).

## M. May 2, 2007 IEP Meeting

An annual IEP review and transition planning meeting was convened on May 2, 2007. The student's Probation Officer attended the meeting. (SD 47; PW 187). The IEP reports that the student is at the 1.7 level in math and the 3.5 level in reading, based on the 2006 Monroe-Sherman. (SD 48; PW 188). The student's prior educational program of 920 mpw in a self-contained classroom was continued. (SD 61;PW 197). ESY is required for seven weeks. (SD 50; PW 190). Required modifications and accommodations are essentially the same as those in the prior IEP. (SD 51-52; PW 191-192). The prior modified criterion for grading is continued, with the addition of points for daily participation. (SD 52; PW192). A calculator, tape recorder and computer are listed as required AT during school hours. (SD 51; PW191).

Each of the student's PLOPs state that she is functioning below grade level, is at 1.7 in reading, and "needs to come to school on time." (SD 54-59; PW 193-196). Her English annual goal is "State Goal 2: Read and understand literature representative of various ideas." Benchmarks include "compare and evaluate oral, written works from various eras, "evaluate the influence of historical context on form and point of view for a variety of literary works," and "discuss and evaluate motive, resulting behavior demonstrated in literature," with increasing percentages of accuracy. The student is to be evaluated on this goal every five weeks through oral or written tests. (SD 56; PW 196). The math goal is "State Goal 9: use geometric methods to analyzed, categorize and draw conclusions about points, lines, planes." The benchmarks prepared to help the student achieve this goal include "recognize and apply relationship within and among geometric figures," "compare geometric figures and determine their properties," and "formulate logical arguments about geometric figures," each with increasing percentages of accuracy. Oral or written evaluations of progress are to occur every five week. (SD 53; PW 194). The annual science goal is "State Goal 12: understand the fundamental concepts and principles of the physical sciences." Benchmarks, to be measured by increased accuracy, include "describe the chemical and physical characteristics of matter," "explain interactions of energy with matter including changes of state," and "explain the factors that affect the gravitational forces on objects." Oral or written evaluation is to occur every five weeks. (SD 55; PW 195).

The IEP contains a transition plan with three transition goals. As in the academic goals, the PLOPs state that she is below grade level and needs to come to school on time. The goals include developing transitional skills leading toward employment, toward college and improving skills for independent living. Benchmarks include: completing job/vocational/college application, showing understanding of job requirements, and demonstrating good work habits; showing an understanding of types of colleges, determining an area of interest, and showing an understanding of college programs; and, showing independent housekeeping skills, wearing appropriate clothing, and preparing a grocery shopping list. No evaluation procedures are listed. (SD 5a6-59; PW 202-205).

## N. May 17, 2007 IEP Meeting

The student's IEP was revised on May 17, 2007. The student, her father, and two Probation Officers attended the meeting. (SD 35; PW 184). The document notes that the student and her parent requested a more intensive reading program. The district agreed to evaluate the student to determine her current reading level and to develop an individualized reading program. Both a speech and language screening and an AT evaluation were to be completed. (SD 36;PW 185).

The student's Probation Officer wrote a dissent to the May 2nd IEP, stating that the district failed to provide reading and math programs that met the student's needs. She noted that the student was at the 1.7 grade level in reading and 3.5 grade level in math. The dissent asks that the district place the student in a private therapeutic day school. (PW 186).

## O. District's May 2007 Speech/Language Evaluation and Reading Assessment

The district's speech/language pathologist, Levita Stringer, evaluated the student in May 2007. Ms. Stringer assessed the student's language and articulation. On the Comprehensive Receptive and Expressive Vocabulary Test -2nd Ed., the student's receptive vocabulary standard score was <55, which is at <1st percentile. Her expressive vocabulary standard score was <54, which is also at <1st percentile. (SD 40; PW82). On the OWLS, her listening comprehension was at the 0.3 percentile, oral expression at the 0.1 percentile, and oral composite at 0.1 percentile. She received a standard score of 94 on the Goldman Fristoe Test of Articulation. (SD 39; PW 81). Ms. Stringer determined that the student's listening comprehension and oral expressive language scores are significantly below average, and her receptive and expressive vocabulary skills are below average. Her articulation skills are appropriate. Based on these results, the examiner found the student eligible for speech and language services. (SD 40; PW 82). Ms. Stringer wrote an IEP goal providing 90 mpm of services. The PLOP states that the student "demonstrates below average communication skills." The goal is to improve her skills by "identifying and defining academic vocabulary," "paraphrasing stories/articles and answering questions," and asking questions to find out pertinent information." (SD 41;PW 83).

Tilden's reading specialist, Ms. Benoit, began an evaluation of the student but was unable to complete it because of the student's poor attendance. She went at least seven times to the student's language arts class to observe the student, but the student was not in school and/or class on any of those seven days. She gave the student the Burns & Roe Informal Reading Inventory to assess the student's independent, instructional and frustration reading levels. Even though she began at the pre-primer level, the student became "frustrated and agitated; she was unable to read 18 of the 20 words on that list." However, when the examiner read a pre-primer level passage to the student and asked her the accompanying comprehension questions, the student's comprehension score was 100%. The evaluator also asked the student for a writing sample, but the student was unable to provide her with one. (SD 26; PW 80).

## P. September 21, 2007 IEP Meeting and Student's Dissent to IEP

The school nurse assessment, dated September 21, 2007, reports that the student had failed a 2003 hearing screening. The nurse gave the student a referral for vision and hearing screenings but otherwise did not recommend nursing services. (SD 23; PW 77).

The school social worker, Ms. Jackson-Hill, interviewed the student and reviewed her records. Her report notes that the student missed two years of school because of pregnancies and is a fourth year freshman. It also states that the student has had a history of poor attendance since grade school. The report indicates that the student's mother provides childcare for the student's two daughters. According to the report, the student reported that she suffers from lack of sleep because of caring for her children and has no friends or social life because of her child-care responsibilities. The assessment notes that the student "appears to have difficulty processing information." According to the social worker's report, the student was embarrassed to be around other high school students because of her poor educational achievement. Based on her assessment, Ms. Jackson-Hill recommended services to help boost the student's self-esteem. (SD 24-25; PW 78-79).

The district convened an IEP meeting on September 21, 2007, to review the student's outside evaluations. The student, her attorneys, and one of her Probation Officers attended the IEP meeting. (SD 2; PW 160). The IEP team agreed to placement in a separate day school due to the student's "need for intense remediation in decoding, reading comprehension, mathematics concepts and application. A separate day school setting will provide (student) with a nurturing environment to increase her self-esteem relating too her academic abilities as well as providing additional transitional skills for adult life." (SD 18;PW 176). Goals were developed for math, independent functioning, social studies, science, language arts (written expression, word attack, reading comprehension) and social emotional. The goals include specific levels of performance, indicating that the student is at a pre-primer level in reading and math. Details are provided on how her performance level impacts the subject matter. The goals incorporate AT where appropriate. (SD 8-16;PW 166-174). Numerous modifications and accommodations are included to help remediate the student's deficits and build her skills. (SD 7;PW 165). The IEP memorializes the district's offer to continue the student's placement in a separate day school through the 2008-09 school year, including ESY 2009. (SD 21;PW 179).

The independent functioning goal states that the student will "develop self-awareness and self management skills to achieve school and life success. She will demonstrate communication and social skills to interact effectively with others through role playing." Service minutes are for 120 minutes per month. Benchmarks include evaluating the effects of requesting support and providing support, evaluating the application of communication and social skills in daily interactions, and analyzing how conflict resolution skills contribute to working with in a group. (SD 15;PW 168). The social emotional goal calls for 30 mpw of services to improve the student's "self-concept and self-acceptance." Benchmarks include building a trusting relationship with the social worker and verbalizing emotions. (SD 16; PW 169).

Student's counsel filed a dissent to the September 21st IEP. (PW 181). The dissent requests compensatory education, in the form of placement at a private school, through the end of the 2013-14 school year. Further, the dissent states that the IEP should reflect a "graduation" date of April 14, 2011, which is through the day before the student's 22nd birthday. (PW 181).

## Q. District's Assistive Technology Evaluation: November 2007

The district conducted an assistive technology evaluation of the student at Acacia Academy. The report notes that the student's Acacia classroom has at least two computers, with Write Out Loud and Co Writer. An optical character recognition program is also on the computers but was not fully functional at the time of the evaluation. (SD 28).

The AT evaluator, Mr. Wittbrodt, used the Georgia Project for Assistive Technology to asses the student. She was able to read some words in a first grade level paragraph. Her comprehension was very low. Her technological skills were below age level, and she did not know how to save a document or close a program using Ctrl/Alt/Delete in unison. Her keyboarding skills were underdeveloped. She could turn the computer on and off and plug in a USB cord. (SD 28-29).

The student could produce no sentences without the use of AT; however, with the use of word prediction software, her sentence length, vocabulary and production rate all increased. She had difficulty with punctuation, capitalization, and vocabulary when using a standard word processing program. (SD 29).

The student was able to use a reading pen and understood the verbal information provided

13

by the pen. She was able to scan and listen to several age appropriate words and sentences. Her comprehension of auditory language was higher than her comprehension of written language. She was also able to use an electronic dictionary to look up definitions and use the spell check feature. She used and understood a talking book. (SD 29).

The evaluator made several AT recommendations for reading, writing and phonics. Each recommendation contains a specific AT device, compensatory strategies for the AT, a description of how the device may be used and, where applicable, its drawbacks. The evaluator recommended a reading pen, a word prediction program with speech, a word processor with speech, optical character recognition software, books on CD/tape, and phonics software. (SD 29-34).

R. Student's Grade/Progress Reports and District Attendance Records

The student received an "F" as a mid-term grade in all subjects for the first quarter of the 2007-08 school year, while she still was attending Tilden. She was absent 29 days of the quarter. (SD 153; PW 383). In school year 2006-07, the student's grade reports for weeks 25, 30, 35, and 40 state that she received the following grades: Art, all Fs; Band, C, F, C, and D; Physical Education, all Fs; U.S. History, 3 Cs and one D; Geometry, 3 Ds and one C; Biology, 3 Ds and one C; and, American Literature, all Ds. Both history and geometry note that the student was a pleasure to have in class whereas biology and American Literature note poor attendance. (SD 154-157; PW 384-387). The IEP progress reports for art, band, and physical education all request an IEP meeting and indicate excessive cuts and absenteeism. (SD 388; PW 158). A note from the art teacher reports that the student had enrolled in her class on February 23, 2007, and by May 2nd had only been in class on the day of her enrollment. The note reports that the student had told the teacher she was unable to get up early enough to get to class. (SD 162A). For the same period, the IEP progress reports for the student's core subject areas all report that she completed assignments and was meeting her benchmarks. They also request an IEP meeting. (SD 389; PW 158A). In contrast, the 2006-07 second semester transcript reports that the student was absent 41 days and received final second semester grades of F in driver's education, art and physical education, and a D in literature, history, biology, geometry and band. The student was not enrolled for the first semester of the school year. (SD 280).

For school year 2005-06, the June 14, 2006, IEP progress report states that the student was meeting her goals and benchmarks in biology, algebra, world studies and survey literature. (PW 390-391). The transcript for the same time period reports that the student received final grades of F in literature and ROTC, C in world studies and biology, and B in algebra, computer, and music. She was absent 17 days and not enrolled in the first semester. (SD 280). The student's transcript for first semester of the 2004-05 school year indicates that she received a F in all her classes and was absent 57 days. She was not enrolled for the second semester. (SD 280).

Tilden sent notices of unexcused absence to the student's parent on October 12 and 25, 2004, and November 10 and 30, 2004. These were sent after that student had been consecutively absent for five, ten, 15, and 20 days. (SD 196-199). On February 23, 2005, the district issued a "Lost-Cannot Locate" notice.

S. District Attendance Policies and Tilden's School-Based Services Programs

The district's policy on absenteeism and truancy defines a chronic truant as a "student subject to compulsory school attendance and who is absent from such attendance without valid cause for 10% or more of the previous 180 regular attendance days." (SD 221). System-wide initiatives to improve attendance include an absentee out calling system, in which an automated

telephone system is programmed to call the home telephone of absent students, computerized attendance records, and truancy intervention techniques. (SD 221-222). Schools are to make supportive services such as family and student counseling and parent conferences available to truant and chronically truant students. (SD 222). The district also maintains a Department of Chronic Truant Adjudication to conduct truancy adjudication hearings. (SD 223).

Pursuant to the district's policy, a student may be removed from enrollment because of excessive unexcused absences (20 consecutive) only if the student's whereabouts cannot be determined after following the district's procedures on determining such. In such an instance, the school must complete a Lost Child Report. (SD 224.)

Student's with disabilities whose IEPs require services to address truancy "may not be referred for chronic truancy adjudication unless they have received all the services called for in their IEPs to address their truant behavior." (SD 225).

Tilden and SGA Youth & Family Services ("SGA") have a cooperative program through which SGA provides a variety of social services to Tilden's at-risk students. SGA provides a teen parenting program, which is a home and school based psycho-educational program that promotes "children's physical, emotional, and social health in an effort to equip them with the appropriate skills, behaviors and emotions for academic success." (SD 234-235). Tilden also has a Chicago Subsequent Pregnancy Program, the purpose of which is to help first time adolescent mothers delay a second pregnancy. (SD 239-241).

## Student's Testimony

The student testified briefly on the first day of the hearing. She testified that she had experienced reading problems since grammar school and did not understand reading or spelling at Tilden. She testified that she felt sad because she did not know what she was doing at school. She said that she could not read her textbooks or do her homework. She further testified that she put down any answer on tests because she could not read them. She also testified that she was asked to read out loud "a lot." She stated that other students teased her because of these problems and testified that she had reported that to the Dean. She stated that she is learning to read and spell at Acacia.

The student testified that she had been absent because of her pregnancies and had received no homebound services during those times. She testified that her father had informed the school of her first pregnancy.

## Independent Education Evaluations

## A. Psycho-educational Evaluation: May 31 and June 1, 2007

The student was referred to Cheri Laaperi, Ph.D. for an evaluation by one of her Probation Officers because of his concerns about the student's social functioning ability, particularly her "ability to understand others and the consequences of her actions," comprehension abilities, and problem solving skills. (PW 2). Dr. Laaperi conducted a comprehensive evaluation of the student, which included 12 hours of testing over a two day period. She also reviewed CPS documents and a 2006 Juvenile Court Social Investigation and assessed the student's cognitive functioning, achievement levels in reading, math, and both oral and written language. (PW 2-3).

Dr. Laaperi administered the Wechsler Adult Intelligence Scale, Third Ed., to assess the

student's cognitive functioning ("WAIS"). On the WAIS, the student earned a Full Scale IQ of 64, a Verbal Scale IQ of 67, and a Performance Scale IQ of 67. Each of those scores is at the first percentile. Within the verbal area, the student scored at the 5th percentile on a test of abstract reasoning and a test of comprehension. She scored at the 2nd percentile in vocabulary and the 1st percentile in general knowledge of the world. She had difficulty answering questions such as "In what two ways is a lamp better than a candle?" and did not know the number of months in a year. Her scores were somewhat better in the nonverbal performance area, in which she scored at the 5th percentile in Block Design, Picture Completion, and Object Assembly. On subtests related to memory, she scored at the 9th percentile on a test of immediate recall for numerals. Her visual processing speed score was at the 1st percentile. (PW 8-9).

Dr. Laaperi conducted both formal and informal assessments of the student's receptive and expressive language. On the Peabody Picture Vocabulary Test – IIIA, the student's receptive vocabulary was at < 1st percentile, with an age equivalent of 4-1 years. Her listening comprehension, as measured by the Woodcock Johnson: Understanding Directions was at the 2nd percentile. Her overall listening comprehension score was at the 0.3 percentile. (PW 10). The student scored at the 2nd percentile in expressive vocabulary on the Woodcock Johnson: Picture Vocabulary. She scored at the 0.2 percentile in Verbal Comprehension of synonyms, antonyms and analogies and in Oral Comprehension on the Woodcock Johnson. Her overall expression score was at the 2nd percentile on the Woodcock Johnson. (PW 11). The student had difficulty orally formulating her ideas sequentially and logically and described items in a picture rather than telling a story about the picture. She was at the 9th percentile in the oral Story Construction on the Detroit Test of Language Ability-4. (PW 11). The student's overall oral language score was at the 0.3 percentile. Based on these findings, Dr. Laaperi recommended that the student receive a comprehensive speech and language assessment with a licensed master's degree speech and language pathologist. (PW 12).

The student received an overall auditory processing score at the 1st percentile on the Woodcock Johnson. On a test of auditory attention/discrimination, the student scored at the 11th percentile. She was below the 1st percentile on a measure of her ability to form a single word when orally presented without some of its sounds. She scored at the 2nd percentile on a test of sound blending. Based on these scores, Dr. Laaperi concluded that the student "lacks the phonological awareness skills that are not only necessary for listening to and following directions but that are also an important part of the foundation of learning to speak, read, and spell." (PW 12-13).

Dr. Laaperi also evaluated the student's auditory memory. The student scored at the 0.3 percentile on a test measuring memory for unrelated words. She scored at the 9th percentile on a test measuring her memory for sentences. According to Dr. Laaperi, these scores indicate that the student has difficulty remembering rote information but does better with meaningful context. The student scored at the <0.1 percentile in both auditory short and long term memory. Dr. Laaperi concluded that the student has auditory processing deficits and recommended that she receive a central auditory processing evaluation. (PW 13-14).

In the visual processing area, the student scored at the 1st percentile on a timed test that assessed her visual-motor integration and processing speed. In contrast, she scored at the 42nd percentile in a test of visual matching and at the 52nd percentile on a timed test of visual categorization. Her scores on tests of spatial relations, visual sequential memory and visual-motor integration were below average. (PW 15-16).

The student scored at <0.1 percentile on a test of nonsense words, which measured her phonetic skills, and at <0.1 percentile on a test of her ability to read familiar isolated lists of words.

16

Her basic reading skills score was at the <0.1 percentile. Both her oral reading rate and her oral accuracy were at less than the 1st percentile. She was unable to complete a timed test of silent reading fluency of short simple sentences because she was unable to read words. On a pre-reading evaluation based on national late kindergarten norms, she scored at the 38th percentile. (PW 15-16). The student's SS in letter-word identification was 20. (PW 34).

On a measure of recognition spelling, the student scored at <1st percentile. She was unable to complete the editing section on various discrete writing tasks because she could not read the sentences. She scored at <0.1 percentile in a punctuation and capitalization test. When given 15 minutes to write a story that had a beginning, middle and end and included characters with names, the student wrote: "I got to the meet He my gat He some csait / (new line) A mad He gnat He felt a beat/ (new line) a Soccer is diet." This story was in response to a space picture. When asked to read her story back to the examiner, the student read: "I went to the moon with my kids. WE saw stars. A man was digging. He found a rock." (SD17-18).

Dr. Laaperi evaluated the student's knowledge of math concepts, math reasoning, and math applications. The student was not required to read for the math assessment. She scored at the 0.1 percentile on a measure of quantitative concepts. While she knew there are five pennies in a nickel, she did not know how to count by twos. The student scored at the 2nd percentile on a timed test of oral metal arithmetic. She scored at the 0.5 percentile in a measure of her ability to quickly compute single digit addition, subtraction and multiplication problems. On a test measuring her ability to apply mathematical concepts to daily situations, the student scored at the 0.2 percentile. She scored at <0.1 percentile in math calculation, math reasoning and broad math skills. (PW 19-20).

Based on these assessments, Dr. Laaperi determined that the student has deficits in oral language, auditory processing, and visual processing and that those deficits have negatively affected her IQ. She diagnosed the student as having a mixed receptive-expressive language disorder, a reading disorder, a math disorder, and a disorder of written expression. (PW 20-23). Her educational placement recommendation for the student was for placement in an individualized, highly structured classroom with a modified curriculum, a small student-teacher ration, and taught by a master's degree learning specialist. She opined that it is "vitally important" that the student's instructional program include an Orton-Gillingham program or Wilson reading program. (PW 23-26).

Dr. Laaperi also made numerous clinical recommendations, including oral language therapy, specific teaching strategies and techniques, providing direct instruction and support for daily living and social situations, using manipulative in the classroom, and concrete "real life" math. (PW 26-32).

B. Speech/Language Evaluation: July 8, 2007

The student was referred to Janet Marsden-Johnson, Ph.D. for a speech and language evaluation by one of her probation officers. The student was escorted to the evaluation from the Juvenile Detention Center. She told Dr. Marsden-Johnson that she had "not attended high school regularly for three years." She also stated that she had not received the help she needed at school and was frustrated at her lack of academic skills. The evaluation lasted for three hours. Dr. Marsden-Johnson reported that the test results were a good indication of the student's abilities. (PW 39).

On the Peabody Picture Vocabulary Test III-A, the student scored at the 1st percentile in

17

single word receptive vocabulary. The student was given the Test of Auditory Perceptual Skills - 3 and had difficulty with all the subtests. She scored significantly below average in all areas except word discrimination. Dr. Marsden-Johnson concluded that the student had significantly impaired auditory processing skills and thus would have very limited ability to process information in a typical classroom. (PW 40).

Dr. Marsden-Johnson attempted to give the student the Test of Written Language 3, but the student was unable to achieve a score on any subtest. She could not read any of the words required to complete the questions. She was unable to write a story to describe a picture. She could print legibly but stated that she did not know cursive. (PW 41).

The evaluator did not note any specific articulation concerns but commented that the student was, at times, hard to understand because of her low volume and mumbling. (PW 41).

To assess the impact of assistive technology on the student's disabilities, Dr. Marsden-Johnson asked the student to read a short 1-2 grade level book silently; the student was unable to do so. The evaluator then had the computer "read" the book to the student, who followed with the text as it was highlighted. The student took a quiz at the end of the chapter and scored 100% correct on a multiple choice test. She was unable to write about the story because she stated she could not write. She did, however, dictate a summary of what she had read, which indicated that she had understood the story's main points. Dr. Marsden-Johnson showed the student how to use an AT program to write a summary of the chapter, and the student was able to do so. (PW 41-42).

Based on her evaluation, Dr. Marsden-Johnson concluded that the student has a significant speech and language disorder, with deficits in listening, processing, memory, oral and written expression, and reading. The student shows significant deficits in auditory processing skills, vocabulary, syntax , and morphology. These deficits negatively impact her academic progress. Dr. Marsden-Johnson recommended 60-90 mpw of intensive speech-language therapy. She also recommended that AT must be an integral part of the student's academic program. She made specific AT recommendations, including a lap top computer to move between home/school, screen reading software, a talking word processor, word prediction software, an organizer or mapping software, and books for curriculum and leisure reading that the student could access independently. (PW 43).

C. Central Auditory Evaluation: September 14, 2007

The student received a central auditory processing evaluation from Jeanane Ferre, Ph.D. Dr. Ferre's found that the student has normal peripheral hearing sensitivity in each ear. She also concluded that the student has a central auditory processing disorder, which is a deficit in auditory decoding/discrimination skills. (PW 59). Dr. Ferre's recommendations include: aural rehabilitation therapy; work on specific language skills and functional language-learning skills; auditory perceptual training using Fast ForWord; Earobics to strengthen auditory discrimination skills,; games to help improve processing skills; an explicit systematic, multisensory program such as Orton-Gillingham, Wilson, or Lindamood-Bell. (PW 60-61). She also recommended classroom environmental modifications and compensatory strategies for the student. (PW 61-62).

## Statutory Framework

The purpose of the IDEA is to ensure that all children with disabilities receive a free appropriate public education and related service "designed to meet their unique needs and prepare them for further education, employment and independent living." 20 U.S.C. §1400(d)(1)(A). To

must assess a student in all areas of suspected disability and must use a variety of assessment tools and strategies to gather "functional, developmental, and academic information." 20 U.S.C. § 1414(b)(2)(A). A district may not "use any single measure or assessment as the sole criterion for determining whether a child is a child with a disability or determining an appropriate educational program for the child." 20 U.S.C. §1414(b)(2)(B). The IDEA defines a specific learning disability as "a disorder in 1 or more of the basic psychological processes involved in understanding or in using language, spoken or written, which disorder may manifest itself in the imperfect ability to listen, think, speak, read, write, spell, or do mathematical calculations." 20 U.S.C. §1401(30)(A). The term includes dyslexia and perceptual disabilities. 20 U.S.C. §1401(30)(B).

Once a district determines that a student is IDEA eligible, it must develop an Individualized Education Program ("IEP") for the student. The required components of an IEP are clearly laid out in the statute. The IEP must contain the student's present level of academic achievement and functional performance, including a statement of how the student's disability affects her involvement and progress in the general curriculum; a statement of measurable annual goals; and, a description of how the student's progress on annual goals will be measured. 20 U.S.C. §1414(d)(A)(i)(I)-(III). The IEP also must contain "a statement of the special education and related services and supplementary aids and services, based on peer-reviewed research" that the district will provide to, or on behalf of, the student, as well as program modifications or supports. 20 U.S.C. § 1414(d)(1)(A)(IV). If a student's behavior impedes her learning or that of others, the IEP team must "consider the use of positive behavioral interventions and supports, and other strategies" to address the student's behavior. 20 U.S.C. §1414(d)(3)(B)(i).

The first IEP to be in effect when a student turns 16 must contain a transition plan. 20 U.S.C.§1414(d)(1)(A)(i)(VIII). The transition plan must contain "appropriate measurable postsecondary goals based upon age appropriate transition assessments related to training, education, employment, and, where appropriate, independent living skills" and transition services, including courses of study, to help the student achieve the transition goals. 20 U.S.C. § 1414(d)(1)(A)(i)(VIII)(aa),(bb).

The IEP team must consider whether the student requires AT devices and services when it develops the student's IEP. 20 U.S.C. § 1414(d)(3)(B)(v). An assistive technology device is "any item, piece of equipment, or product system. . . that is used to increase, maintain, or improve functional capabilities of a child with a disability." 20 U.S.C. §1401(1)(A). Assistive technology service is "any service that directly assists a child with a disability in the selection, acquisition or use of an assistive technology device," including evaluating a student to determine if AT is needed and training or technical assistance for the student and the student's family and professionals who provide services to the student, if appropriate. 20 U.S.C. §1401 (2)(A),(E),(F). The school district must furnish AT devices prescribed in a student's IEP. 23 Il. Adm. Code § 226.750 (a)(1).

A student's IEP must be reviewed at least annually and revised as appropriate to address any lack of expected progress toward annual goals and in the general curriculum. 20 U.S.C. §1414(d)(4)(A). The transition plan must be updated annually. 20 U.S.C.§1414(d)(1)(A)(i)(VIII).

A parent must request a hearing within two years of the date the parent knew or should have known about the alleged action that is the basis of the complaint unless the parent was prevented from requesting a hearing due to specific misrepresentations by the district that it had resolved the problem that is the basis of the complaint or if the district withheld information from the parent that it was required by the IDEA to provide. 20 U.S.C. § 1415(f)(3)(C), (D).

A parent has a right to an IEE at public expense if the parent disagrees with the district's evaluation. 34 C.F.R. § 300.502(b); 105 ILCS 14-8.02(b). A request for an IEE at public expense must be made in writing to the district superintendent. The district must reimburse the parent for the IEE if the district's evaluation is shown to be inappropriate. If a parent requests an IEE at public expense, the district has five days from the date of a written request to request a due process hearing to show that its evaluation is appropriate. 23 Ill. Adm. Code § 226.180(a).  A parent is entitled to only one IEE at public expense each time the district conducts an evaluation with which the parent disagrees. 34 C.F.R. § 300.502(b)(5).

An IDEA eligible student who requires continued public school educational experience to facilitate her integration into society shall be eligible for such services through the day before the student's 22nd birthday. 23 Ill. Adm. Code § 226.50 (c)(1).

### Conclusions of Law

<u>Did the district provide the student with a free appropriate public education from August 2, 2005, through November 6, 2007?</u>

A two part test is used to determine whether a district has provided a student with a free appropriate public education: first, the district must comply with the IDEA's statutory procedures; and then, it must develop an IEP that is reasonably calculated to enable the student to benefit from the special education and related services. *Bd. of Educ. v. Rowley*, 458 U.S. 176 (1982) ("Rowley"). The student must receive more than a nominal benefit from specialized instruction and related services. *T.H. v. Bd. of Educ. of Palatine Comm. Consol. Sch. Dist.*, 55 F. Supp. 830 (N.D. Ill. 1999). Deficiencies in an IEP can be analyzed under *Rowley's* substantive prong. *Kevin T. v. Elmhurst Comm. Sch. Dist. No. 205*, 36 IDELR 153 (N.D. Ill. 2002). ("Kevin T.").  As the student has alleged no specific procedural violations, this analysis will proceed on the substantive prong.

The student alleges that the IEPs developed for her were so flawed that they denied her an appropriate education. These alleged flaws include: goals that were written without specific levels of performance and were not measurable; goals that were inappropriate because they were not individualized to meet her unique needs; and no goals that provided a peer reviewed research-based reading program individualized to the student's unique needs.  The March 9, 2005, IEP was being implemented at the beginning of the time period covered in the student's complaint. The PLOPs in the March 9th IEP state that the student was functioning below grade level. The exact performance levels were left blank. Essentially the same language is used in the next three IEPs – March 8, 2006, May 5, 2006, and May 2, 2007 – with the addition that the student has deficits in reading comprehension and fluency and in math recall and comprehension. There is nothing that quantifies the severity of these deficits.   The PLOPs in the May 2nd IEP add "needs to come to school on time." Only the September 21st IEP provides specific information as to the student's performance: in math, she can demonstrate knowledge of operations at a 2.4 grade level and can solve single digit addition and subtraction; and in language arts, social studies and science, her PLOPs state that she is functioning at a pre-primer to first grade level, has trouble attaching meaning to words, and has poor comprehension skills. Some of the teachers testified that they would teach a subject differently depending on a student's grade level, e.g. , on a 5th grade level or 1st grade level. Ms. K testified that in 2007, the student was reading on a pre-primer level. However,  the PLOP states that she is below grade level, at the 1.7 reading level. "Below grade level" in this instance is way off mark and, by the teacher's testimony, even 1.7 appears inaccurate. Performance levels are required so that a teacher has specific information on s student's academic and functional levels and on how a student's disability impacts access to the curriculum to help the teacher  plan how to teach the student.  This information is not provided on the relevant IEPs until

As to whether the IEP goals and benchmarks are measurable, both of the 2006 IEPs as well as the May 2nd IEP indicate that the student's progress will be measured by local/state assessments. The benchmarks routinely state phrases such as "expand knowledge with 70% accuracy" or "75% mastery," at the instructional level. An IEP must contain specific goals, and the goals and objectives must provide measurable criteria against which the student's achievement can be measured. *Independent Sch. Dist. No. 701, Hibbing Pub. Sch. v. J.T.*, 45 IDELR 92 (Minn. 2006) ("Hibbing"). The academic goal at issue in *Hibbing* stated that the student would improve his functional academic skills from a level of not completing assignments independently to a level of being able to read, write, and do basic math skills independently. The benchmark was "given a reading assignment at his level, student will complete the assignment with 80% accuracy as measured by the teacher grade book." The court held that this goal was not specific because it did not name specific skills and thus could apply to a wide range of conduct. The *Hibbing* court also found that neither the goals nor the benchmarks provided objective criteria against which the student's progress could be measured. Likewise, the goals in the matter before this hearing officer do not indicate specific skills this student is to learn. To identify events and trends in history or write to communicate for a variety of purposes, for example, are generalized statements and not specific skills. Additionally, there is little, if any, connection between the goal and objectives and measurement by the student's ITBS scores. Thus, the IEP goals and objectives do not meet the requirements of the IDEA or the standard set out in *Hibbing.*

The student also complains that the IEP goals were not individualized to meet her unique needs and did not provide a peer-reviewed research based program. Both JC and VS, two of the student's teachers, testified that they took the IEP goals directly from the Illinois state learning standards. Although they testified that they were required to use the state standards in writing goals, neither was able to point to any policy or other evidence supporting this contention. While Illinois' special education regulations require that IEP goals "reflect *consideration* of the State Goals for Learning and the Illinois Learning Standards," this hearing officer does not interpret that provision to mandate rote copying of the state goals and standards into a student's IEP. 23 Ill. Adm. Code § 226.230(a)(1). (emphasis added). Indeed, any such requirement would contravene the IDEA's mandate for individualizing a student's program to meet her unique needs. 20 U.S.C. §1400(d)(1)(A); 34 C.F.R. § 300.39(b)(3). *See, Heather S. v. Wisc.*, 125 F.3d 1045 (7th Cir. 1997) (holding that an IEP must be tailored to the student's unique needs).

While the student's teachers testified that they taught the state standards at the student's "instructional level" - apparently in an effort to show that doing so individualized the goals and curriculum for the student – their descriptions of how this occurred raise serious questions as to what was actually taught or learned in this process. JC, one of the student's English teachers, testified that she taught the student "relationships between and among literary elements such as character and plot" by having the student point out characters after listening to a story. She stated that she had to "break down" the student's textbooks and workbooks so that the student could understand them. Another of the student's language arts teachers testified that during the time she taught the student, the student could not spell, read independently, or comprehend what she was reading. Despite these severe deficiencies, the goal she implemented was to "read and understand literature representative of various ideas." VS, the student's geometry teacher, testified that the student was able to draw a point, line and plane, thereby apparently demonstrating knowledge of basic geometric concepts. She also testified that although the goal was written for algebra, she taught the student geometry.

Dr. Laaperi testified that the vast majority of the IEP goals were beyond the student's ability

21

level because she could not read, write or spell and had math skills at the early elementary level. If the student had no hope of accomplishing these goals, it follows that they could not have been written to address her individual needs. Although the district's witnesses all testified that the student's IEP goals provided her with educational benefit, a finder of fact is not required to conclude that an IEP is appropriate simply because teachers and other professionals testify that it is appropriate. *County Sch. Bd. Of Henrico Cnty v. Z.P.* (4th Cir. 2005).   Based on the testimony and evidence presented during the hearing, the hearing officer finds that the IEP goals developed during the relevant time period are not tailored to meet this student's unique needs.

The student's allegation that the goals did not provide a peer-reviewed research based program is, essentially, an allegation that the IEPs did not provide an effective method for teaching her how to read. Learning to read is clearly one of this student's unique needs, as attested to by her teachers, district evaluators, and the independent evaluators.  Nothing in the language of the goals would lead to a conclusion that a peer reviewed, research-based program was provided to the student.  None of the English/Language Arts teachers could articulate a systematic method that they had implemented to teach the student to read. Reading a story to the student and having her point out characters does not teach her to read, though it may somewhat help in her comprehension of the story.  JC testified that she had to break down the student's textbooks and workbooks so that she could understand them.  Providing a student with materials so far about her reading and comprehension level that she is unable to use them does not teach a student to read. It would not be unreasonable to suspect that doing so might lead to frustration rather than learning. WD testified that she had never heard of the Wilson, Lindamood Bell, or Orton-Gillingham methods of teaching reading. She also testified that  she read to the students in her class because so many of them could not read.

Dr. Laaperi testified that the IEP goals did not address the student's need for a systematic phonics program to teach her how to read.  Dr. Laaperi concluded that on the basis of her evaluation, which found the student reading at the pre-primer level and unable to sound out words, the student had not been taught how to read.  She further testified that most of the IEP goals and benchmarks were inappropriate because they required skills the student did not have: she could not accomplish them because she did not know how to read. For example, Dr. Laaperi testified that the student could not read "with fluency and understanding" because she had not yet learned to read.  She testified that the language arts goals did not include a systematic phonics method or any other methodology. She described the student's reading skills as "one of the worst, if not the worst, I have ever seen."

The district, citing *Lachman v. Illinois State Board Of Education*, 852 F2d 290 (7th Cir. 1988) ("*Lachman*"), argues that it is within its discretion to determine methodology. *Lachman* is distinguishable on its facts. In *Lachman*, the parents wanted the district to use cued speech while the district proposed a total communication program for the hearing-impaired student.  The court, after finding  that the district's program was based on "an accepted, proven methodology,"  held that methodology was left to the district's discretion. *Id.* at 297.  Unlike the district in *Lachman,* the district here did not provide an "accepted, proven methodology" to teach this student to read, until the September 21st IEP. The district's reading instruction for this student, based on the teachers' testimony and a review of relevant IEPs, had no systematic research-based methodology and questionable content  The hearing officer finds that the IEPs at issue do not provide a research-based, peer reviewed reading program and thus are not individualized to meet the student's unique needs.

This is not to say that individual teachers did not, at times,  extend themselves to the student. WD testified that she had offered to tutor the student on her own time and had given her a

22

given the student a book and CD over winter vacation to help her reading and activate her interest. But the IDEA requires more than kindly efforts: it requires results, programs that help a student meet her goals and progress toward further education, employment and independent living. 20 U.S.C. §1400(d)(1)(A). The district's "program" did not produce such results.

The student also alleges that, until September 21, 2007, her IEPs failed to change her special education placement and/or related services despite her minimal progress. The district asserts that the student's progress reports show that she did make progress during the relevant time period. After thoroughly reviewing these documents, this hearing officer cannot reach the same conclusion. In 2005-06, the student's transcript shows that she received final grades of F in literature, C in world studies and biology, and B in algebra. The progress report for week 40 in 2006-07 indicates that the student received Ds in history, geometry, and literature and Fs in art and physical education. In the second semester of that academic year, the student received a final grade of D in each of her core subjects. One problem in determining what these grades actually measure is that the student was graded using a modified criterion. More importantly, though, is the testimony of her teachers. JC testified that the student's grade was based on the work she did when she attended class. She stated that the grade was to encourage the student to come to class. The case manager testified that she had not called for an IEP meeting despite the fact that Week 40 progress reports indicated the student was receiving four Ds and two Fs. The majority of the student's grades were on the edge of failure for the time in question, and going from F, C and B to all Ds is not progress.

A review of the IEPs shows that the student received no related services during these years. Dr. Marsden-Johnson testified that the student should have received speech/language services as she has had a speech/language disability for "a very long time." She also testified that, based on the student's auditory processing score, the student could not understand what was going on in the classroom. She stated that the student could improve her skills in this area with speech/language therapy and class accommodations and developing compensatory strategies. As indicated previously, Dr. Laaperi testified that the student needs a systematic, phonics based program to learn to read and that she has never had such a program. She testified that with the right remediation, the student could improve her reading level. There is reliable evidence that the student's disabilities in reading, speech/language, and central auditory processing are not new and significantly interfered with her ability to learn. How the student could have made progress when her IEP did not provide the services or program necessary to address all her disabilities has not been explained.

Ms. Connor, the student's teacher at Acacia, testified via telephone regarding the student's performance at Acacia. Ms. Connor has a master's degree in special education and social/emotional disorders. Ms. Connor testified that the student could not read when she began at Acacia: she knew 70% of her letters and no short vowel sounds. Ms. Connor testified that the student now knows all the letter sounds, though she has trouble with "Qu" and short "e" and "a." Ms. Connor uses the Wilson Reading Program with the student. Ms. Connor testified that AT helps reinforce the work she does with the student and said that the student is "very attentive" to the Earobics and Lexia programs. She also testified that the student's attendance has been good at Acacia. As of December 6, 2007, the student had only three absences, and those were due to illness and doctor's appointments.

The district contends that the adequacy of an IEP is determined at the time it is offered to the student. However, an IEP is a "living" document that is continually implemented with the student. A district may not ignore a clearly failing IEP or continually implement an IEP, without

The district knew that the student - an 18 year old ninth grader - did not know how to read and had minimal math skills for a girl of her age. Ms. Lopez, who had evaluated the student in 2006, testified that the student tested at the lowest possible level in four of five areas on a standardized achievement test. Clearly, the IEPs offered to this student were failing her.

A student's intellectual potential must be taken into account in determining whether the IEPs were reasonably calculated to provide educational benefit. *Ridgewood v. N.E.*, 172 F. 3d 238 (3d Cir. 1999); *Kevin T. v. Elmhurst Comm. Sch. Dist. No. 205*, 36 IDELR 153 (N.D. Ill. 2002) ("Kevin T."). Two of the district's school psychologists, Dr. Schwartz and Mr. Apollo, testified that the student's overall cognitive functioning is in the cognitively delayed range and that she has a slow rate of growth. Dr. Schwartz testified that the student's scores had not declined between 2000 and 2003 but rather had shown a slower rate of growth. The district has consistently determined that the student is learning disabled, not cognitively delayed, because of discrepancies among her subtest scores and because of her adaptive skill levels. Dr. Laaperi's evaluation also found that the student's IQ is in the cognitively delayed range but additionally concluded that her "deficits in oral language, auditory processing, and visual processing have negatively affected her IQ." While the weight of the evidence shows that the student's current cognitive functioning is in the cognitively delayed range, it is important to note that *no one* argues that this means that the student cannot learn to read, write, and develop math skills.

Dr. Laaperi testified extensively regarding her evaluation of the student and the IEPs developed for the student over the years. Dr. Laaperi testified that the student's IQ has gone down from 2003 to the present, as measured on tests of cognitive ability. She defined IQ as the potential to learn and testified that the student had not been learning information in school because she had not been provided with an appropriate education. She stated that learning to read could bring up the student's scores on the WAIS. She further testified that because the student's WAIS scores are all in the extremely low range and she has no areas of strength, she had not learned the information necessary for the assessment. Dr. Laaperi testified repeatedly that many of the skills the student is currently lacking – e.g., auditory skills, blending sounds, phonological awareness, memory skills – can be taught.

Mr. Apollo testified regarding Dr. Laaperi's evaluation. Mr. Apollo has a specialist degree in school psychology, which he described as "skipping over a master's degree plus 30 hours." He attended the September 21st IEP meeting but has never worked with the student directly. He has worked for the district for four years. Mr. Apollo testified that he was struck by Dr. Laaperi's observation that the student became fatigued during the testing. He commented on the length of the evaluation – 12 hours – and testified that if a child became fatigued during an evaluation, he would postpone the testing because of a concern that fatigue would affect the student's performance. He further testified that based only on the student's WAIS IQ score, she would be classified as cognitively delayed. To make a differential diagnosis between learning disabilities and cognitive delay, Mr. Apollo asserted that the student should have been given a current adaptive functioning assessment. Despite this assertion, it must be noted that the district did not updated its adaptive functioning assessment of the student. Moreover, the district is not disputing the student's classification as a learning disabled student. Mr. Apollo stated that there was a strong possibility that, because of the student's slow rate of learning, she could lose what she had learned if she were not in school. He also testified that it is possible for a student's IQ to decrease if the student is not taught appropriately. Mr. Apollo was thoughtful in his answers and asked for clarification when necessary. The hearing officer finds his testimony credible but limited by the fact that he has no direct experience with the student in terms of either evaluation or teaching.

24

The District argues that it did not have the opportunity to provide the student a FAPE because of her lack of attendance. Extensive testimony regarding the student's attendance, or lack thereof, was presented. All of the district's witnesses testified that the student's attendance problems contributed to her lack of progress yet they also testified that the IEP team never discussed her attendance problems or addressed them in the IEP. Ms. B, the case manager, testified that she did not schedule a staffing when the student received failing grades in 2007 because that "was the teacher's job." She testified that the student's failure was due to her chronic absences and said she had talked with the student about her absences. She stated that the student had told her that her absences were because of childcare problems. The student's probation office testified that the student did not have childcare problems.

DC, the attendance coordinator, testified extensively regarding the student's attendance. According to DC, Tilden followed all policies and procedures in regard to this student by making automated phone calls to the home and sending the community representative out to the student's address of residence to find out why she was not in school. DC testified that the community representative was told by neighbors that the family was not there. She stated that while documentation is routinely made on phone calls and community representative home visits, she is not in charge of that documentation and so could not provide it. She testified that the student "always came late" and, when asked why, stated that she had overslept or needed car fare. DC testified that she had wanted to meet with the student's mother in 2004 regarding attendance, but the mother never came for a meeting. Later in her testimony, however, DC stated that she had only dealt with the student for the past two years. DC also testified that she talked with the student many times regarding her attendance problem and offered to help the student access services available at the school. Later in her testimony, however, DC testified that the student "never" talked to her. She did say it was possible that the student "may have slipped through the cracks."

DC also testified regarding the re-enrollment meetings that occurred when the student returned to school after her pregnancies. DC testified that there were two re-enrollment meetings, one in 2006 and the other in 2007. She stated that both meetings were attended by the student, her father, the assistant principal, DC, a special education provider, and the student's probation officer. DC testified that the student and her father refused to sign an attendance both in 2006 and 2007 because they were advised not to do so by the probation officer. She further testified that because of the student's special needs, there were no consequences to not signing the contract. However, according to DC, the student did not become part of the school's truancy intervention program because she had not signed the contract.

Student's counsel, with agreement of district's counsel, called the student's probation officer, Ms. Wardlaw, as a rebuttal witness. This witness had not been on the student's final witness list. Ms. Wardlaw has been a probation officer for ten years and has been the student's probation officer since November 2006. She testified that student's counsel had not discussed DC's testimony with her. Ms. Wardlaw testified that she had attended the February 2007 re-enrollment meeting at which the student was asked to sign an attendance contract. She stated that it was "the worst re-enrollment I have ever been at in my entire career." Ms. Wardlaw testified that the school actively tried not to re-enroll the student, first by stating that her medical form was out of date and then by saying the student's IEP was out of date. Ms. Wardlaw testified that she contacted the district liaison, who told the school that the form was updated. She testified that the school also told the father that he could be charged with educational neglect because of the student's absences. As to the attendance contract, Ms. Wardlaw testified that she did advise the student and parent not to sign it because the contract was totally blank. She stated that the school had refused to fill out the contract and had written no services into the contract. . She testified that she had asked the school to fill out the contract but they had refused to do so. She testified that if the

She said she was concerned about what the school would do with a blank, signed contract. In her opinion, the school was actively trying to get the student not to return to school. The hearing officer finds Ms. Wardlaw's testimony direct, forthright, and credible.

As to DC's testimony, her testimony regarding the 2007 re-enrollment meeting is not credible. That testimony, as stated above, was directly contradicted by Ms. Wardlaw. There are also other problems with DC's testimony, some of which contained direct contradictions of earlier testimony. While this hearing officer is cognizant of the difficulties a witness faces in testifying for many hours over a two day period, with a several week break in between, those difficulties do not explain the contradictions. For example, DC testified that she had talked with the student regarding her absences and even offered to help her get services. Later, she testified that the student never talked to her. It cannot be both ways. Therefore, those parts of her testimony related to her interactions with the student are not credible. As to her testimony regarding the school's attendance policies, services and records, the hearing officer finds her testimony credible but limited by the fact that no documentation was produced to corroborate her statements regarding phone calls to the student's home, community representative visits to the student's home.

DC testified that the school was not informed of the student's pregnancies until after the fact. Several Tilden staff also gave the same testimony. The student testified that her father had informed the school of her first pregnancy and that she never had homebound services. The father was not called as a witness, so there is no way to corroborate this information. Also, neither side produced any documentation that homebound services had been requested and denied by the school.

The student's independent evaluators were asked for their opinions as to whether there was a connection between the student's absences and her academic progress. Dr. Marsden-Johnson stated that consistency in treatment is important in order for the student to make progress. She also testified that intensity of services is important because the student is so far behind. She said the student told her she had not attended regularly because she has two children and felt like a failure at school. Dr. Laaperi testified that based on the IEPs she reviewed, better attendance would not have helped the student progress.

There is no doubt that the student missed significant amounts of school, at least in part due to her two pregnancies. Whose "fault" was it that she did not receive homebound services while pregnant? The student presented no evidence on this other than her uncorroborated statement that her father had informed the school of her pregnancy. As to the student's truant behavior, however, the district did nothing to address this problem even though each IEP member testified that she knew about the problem and felt that the student's absences were impacting her progress. Although the district contends that the student's absences were not disability related, the IDEA requires that the IEP team must "consider the use of positive behavioral interventions and supports" if a student's behavior impedes her learning. 20 U.S.C. §1414(d)(3)(B)(i). Additionally, the district's truancy policy on students with disabilities supports providing services to such students with services to address their truant behaviors. The student's IEP team neither discussed the reasons for her chronic truancy nor considered behavioral interventions to address the behavior. Finally, Ms. Wardlaw's testimony regarding the obstacles the district raised when the student wanted to re-enroll in 2007 raises serious concerns about the district's response to this student. The district has not fulfilled its duty – under the IDEA and its own truancy policies – to address the student's truancy behavior that impacted her learning.

As to the student's contention that the district misled the student and her parents by

26

benchmarks, the hearing has found that such statements did not accurately represent the student's progress. However, neither parent was called to testify regarding their knowledge of the student's progress and what they understood about her progress from the progress reports. It is also unclear whether the student is arguing that because of this alleged misrepresentation, the statute of limitations has not run. If that is the student's argument, it has not been clearly stated. Moreover, the student has introduced no evidence as to whether the student and her parents were misled by the district's statements. Therefore, as to this specific allegation, the student has not sustained her burden of proof.

### *Did the district fail to appropriately evaluate the student and, if so, did that failure deny the student a free appropriate public education?*

The district's 2006 psychological evaluation consisted of one assessment battery. Ms. Lopez, who conducted that evaluation, testified that she had not given the student a full battery of IQ tests because the student had received a full battery in 2000. She stated that unless something unusual occurs, such as a traumatic brain injury, a person's cognitive functioning is stable. She stated that she did not evaluate the student for sensory or processing deficits. Ms. Lopez testified that the teachers' reports that the student was passing all her subjects "threw" her because the student tested at the lowest possible level in four of five areas. She testified that she talked with the student's teachers, who reported that a modified criteria was used to grade the student and that the student was a "good student" who was doing her homework.

Despite this testimony, the district had ample evidence in 2006 of the student's deficits. Her ITBS scores consistently showed a very low level of academic achievement in both reading and math. The district's 2003 evaluation had revealed weaknesses in the student's verbal and quantitative reasoning, short-term memory, and visual memory. The K-TEA showed that she was at <1st percentile in reading and math and could not sound out words. In 2006, another district evaluation found that the student's reading level was 1.7. Despite all this evidence, the district never evaluated the student to determine the cause of these problems.

Ms. Rezabek is an educational audiologist with the district. She has been an audiologist with the district for 21 years. She has a master's degree in audiology and is licensed in Illinois as an audiologist. She also holds a certificate of clinical competency in audiology and a Type 73 certificate. Ms. Rezabek testified that a central auditory processing evaluation should be conducted as part of a full individual evaluation and repeated as part of each re-evaluation. According to Ms. Rezabek, a central auditory processing disorder should be suspected if a student is not learning to read. The district has never conducted a central auditory processing evaluation of the student.

The district's first speech/language evaluation of the student was done in 2007. The speech pathologist recommended 90 minutes per month of services. Dr. Marsden-Johnson reviewed the one goal developed by the district's speech/language pathologist and testified that it was not specific and was insufficient to meet the student's needs. Dr. Marsden-Johnson testified that the student has had a speech/language for a "very long time."

The district conducted its first AT evaluation of the student in 2007. Mr. Wittbrodt testified regarding his AT evaluation of the student. He has been an AT evaluator with the district for two years. Prior to this current position, he was a teacher of the visually impaired and an orientation and mobility specialist with the district for 18 years. He holds two master's degrees and will receive his third M.A. later this year. He stated that the student was cooperative and "had a lot of difficulty

with basic academics." According to Mr. Wittbrodt, a reading pen would be "great" for the student because she could use it at both home and school. He did not recommend a laptop for the student because of her difficulty operating a computer. He stated that he had to use a hand-over-hand technique to help her use the computer. He did not recommend that the student learn keyboarding at this time because she has so many other things to learn. However, he did recommend a word processor with speech, such as the Alpha Smart Neo. He testified that the student was also excited about talking books and asked to complete that work she had started on one. Mr. Wittbrodt directly and thoroughly answered questions regarding his evaluation of, and recommendations for, the student. He expressed a concern not only for the student's low levels of achievement but also sensitivity to the amount she needs to learn and the possibility that she could be overwhelmed by too many new things thrown at her at once. As he stated, "you can put it on her plate but she has to have an appetite too." The hearing officer found the witness credible.  Although the IDEA requires that an IEP team consider whether a student requires AT, there is no evidence that the district followed that mandate.  It is clear from Mr. Wittbrodt's report and testimony that the student should have had an AT evaluation before 2007.

The three independent evaluations provide a picture of the student's disabilities that is quite different from, and more complex than, that presented by the district.  Dr. Marsden-Johnson testified regarding her speech/language assessment of the student.  Dr. Marsden-Johnson has both a master's and doctoral degree in speech and language pathology. She has a private practice assessing and treating children, adolescents and young adults, and also teaches assistive technology and augmentative communication to graduate level students at the University of Illinois-Chicago. She regularly attends IEP meetings as part of her private practice. She holds an Illinois teaching certificate for grades k-12 and is licensed in Illinois as a speech/language pathologist.

Dr. Marsden-Johnson testified that the student  "clearly struggled" but had tried her hardest during the evaluation. Dr. Marsden-Johnson said the student's score on the PPVT was "at the very bottom of the pile" for an 18 year old. She testified that she had been unable to give the student some of the assessments she wanted because the student had scored so poorly on the assessments she did give her. During her testimony, Dr. Marsden-Johnson recommended that the student receive intensive 1:1 speech/language services for 120-150 mpw. This service amount is different from that provided in her report; however, she said that after reviewing the CPS testing, she changed her recommendation. Dr. Marsden-Johnson testified that  the Juvenile Court has fully paid her for her evaluation of the student.

Dr. Marsden-Johnson  reviewed the district's November 2007 AT evaluation and stated that it was a "very good report," although she said that such an evaluation should have been conducted years ago. As to the correct technology for the student, the witness testified  that many different and appropriate programs are available and can be individualized to the student's needs. She stated that the student should receive AT re-evaluations as her AT need would change over time.

Dr. Ferre has a master's degree in audiology and a doctoral degree in audiology and hearing impairments. She has been in private practice for 20 years as a clinical audiologist, with a specialty in treatment.  She explained that a central auditory processing disorder is a neuro-developmental disorder, the impact of which increases over time if it is untreated because demands on a person increase over time.  She testified that a person with such a disorder is impacted in academics, sense of self, and community skills.  She described an auditory decoding deficit as the brain not doing a good job of hearing information that is there.  This "mis-hearing" places the student at risk for secondary deficits in reading and spelling.  It also impacts vocabulary development and language skills. According to Dr. Ferre, a student with a central auditory processing disorder needs IEP goals that address the day-to-day impact of the disorder and

She testified that a person's audiology system remains plastic throughout one's life, and there is "compelling evidence" that age does not interfere with the benefit one can receive from aural rehabilitation therapy. She also testified that reading is heavily dependent on intact auditory discrimination and that reading problems are a "red flag" to assess a student's central auditory processing. Dr. Ferre testified that she has completed the paperwork required by the Juvenile Court to be paid for her evaluation and has submitted it to the Court.

Ms. Rezabek testified that she agrees with Dr. Ferre's findings and recommendations, although she does not agree with naming specific programs. She believes that doing so limits the service provider to the specifically named program. She stated that she agrees with the following of Dr. Ferre's goals: speech sound discrimination training, lipreading/speechreading training, metalinguistic/metacognitive skills training, and auditory closure training. She did not agree with the goal for auditory vigilance training because Dr. Ferre's report states that the student has "adequate listening habits" and because Dr. Ferre did not assess the student in this area. She also disagreed with the goal for speech recognition in noise, which she said was contraindicated by an earlier finding in Dr. Ferre's report.

As to the student's request that the district pay for the IEEs, the student has shown no legal basis for this request. The evaluations were conducted pursuant to a request by the Juvenile Court and were completed prior to the filing of the due process request. Ms. Neal, one of the student's probation officers, testified that she did not submit a written request for an IEE to the district's superintendent. Moreover, the record clearly shows that Drs. Laaperi and Marsden-Johnson have been fully paid for their evaluations. As to Dr. Ferre, she testified that she has submitted the required paperwork to be paid for her evaluation. The hearing officer finds the student's request rather troubling, given the evidence presented.

A district must ensure that it recognizes a student's needs and completes a full and individualized evaluation. *Kevin T.* The failure to fully evaluate a student leads to inadequate programming. *Bd. of Educ. of Oak Park and River Forest H.S. Dist. No. 200 v. Kelly E.*, 21 F. Supp. 2d 862, 875 (N.D. Ill. 1998) ("Kelly E."). The district did not fully evaluate this student. The district also did not provide a timely AT evaluation, as it did not evaluate the student's AT needs until 2007. This failure to fully evaluate the student has led to inadequate programming and related services. Based on all of the above, this hearing officer finds that the student has shown by a preponderance of evidence that the district denied her a free appropriate public education during the relevant time period stated in the complaint.

The student argues that the district's offer to place the student at Acacia through ESY 2009 is insufficient for the FAPE that she has been denied. Compensatory education is an equitable remedy, providing future educational services to a disabled student for a district's failure to provide the student a FAPE in the past. Compensatory education may be awarded to a student past the age of 21 to cure a district's past failure to provide the student a FAPE. *Bd. of Educ. v. Illinois State Bd. Educ.*, 79 F.3d 654, 656 (7th Cir.1996). A claim for compensatory education that would occur past the age of entitlement is not ripe until the student reaches the age of entitlement. *Kelly E.*, 21 F. Supp. 2d 862 (N.D. Ill. 1998). This hearing officer has found, as detailed above, that the district has denied the student an appropriate education. The proper remedy, however, is a complex question.

The district has offered to maintain the student's current placement through school year 2009. However, the student is entitled, under Illinois law, to a FAPE until the day before her 22nd birthday, April 14, 2011. The district must maintain the student's placement at Acacia until that

date, if the IEP team and the student agree that Acacia remains an appropriate placement. Otherwise, the district must provide an appropriate vocational program for the student through that date. The student is cautioned that the responsibility for her continued education does not lay on the district's shoulders alone. She must attend school to take advantage of this opportunity. As Mr. Wittbrodt aptly noted, "you can put it on her plate but she has to have an appetite too." Based on *Kelly E.*, the hearing officer finds that any claim the student may have for compensatory education is not ripe until she turns 22.

IT IS ORDERED THAT:

1. The district must convene an IEP meeting within 10 school days of the date on which it receives this order. The IEP must include appropriate Acacia and CPS staff, as well as the student. The IEP team is to develop an IEP providing:
   a. AT services and devices as provided in the district's AT evaluation, including an annual AT re-evaluation of the student's AT needs;
   b. speech/language services for 120-150 mpw, with goals that incorporate the findings and recommendations in Dr. Marsden-Johnson's report; and,
   c. aural rehabilitation therapy and the central auditory processing goals as identified in Ms. Rezabek's testimony.

2. The district is provide the student an appropriate educational placement until the day before she turns 22, at Acacia if the Acacia staff and IEP team determine that Acacia is still meeting the student's needs or at a vocational program that can meet her needs.

3. The district is to conduct an appropriate vocational assessment of the student and incorporate all findings and recommendations from that assessment into the student's IEP and transition plan. The district is to provide all services recommended in the vocational assessment.

4. The student's request that the district pay for the independent evaluations by Drs. Laaperi, Marsden-Johnson, and Ferre is denied.

5. The student's request that the district pay for her to attend a pragmatic social interactions class is denied. The student's current IEP includes a goal that addresses the skills typically taught in such a class, and the mpw for that goal are adequate. Moreover, the student will learn these skills in a "natural" setting, her classroom with peers and teachers with whom she is familiar.

### Order

Within forty-five (45) days of receipt of this Order, City of Chicago School District 299 shall submit proof of compliance to:

Illinois State Board of Education
Program Compliance Division
100 North First Street
Springfield, Illinois 62777-0001

Either party may request clarification of this decision by submitting a written request for such clarification to the undersigned hearing officer within five (5) days of receipt of this decision. The request for clarification shall specify the portions of the decision for which clarification is sought, and a copy of the request shall be mailed to the other party(ies) and the Illinois State Board of Education. After a decision is issued, the hearing officer may not make substantive changes to the decision. The right to request such clarification does not permit a party to request reconsideration of the decision itself, and the hearing officer is not authorized to entertain a request for reconsideration.

## **Right to File Civil Action**

This decision is binding on the parties unless a civil action is timely commenced. Any party to this hearing aggrieved by this final decision has the right to commence a civil action with respect to the issues presented in the hearing. Pursuant to ILCS 5/14-8.02a(i),that civil action shall be brought in any court of competent jurisdiction within 120 days after a copy of this decision is mailed to the parties.


ISSUED: February 4, 2008

Mary Schwartz
Due Process Hearing Officer

## CERTIFICATE OF DELIVERY BY MAIL

The undersigned hereby certifies that a copy of the Decision and Order was sent by certified mail with return receipt from Chicago, Illinois, and directed to:

Ms. Rachel Shapiro, Esq.
Equip for Equality
20 North Michigan Avenue, Ste. 300
Chicago, Illinois 60602

Ms. Tracy Hamm, Esq.
Due Process & Mediation
Chicago Public Schools
125 South Clark Street, 8th Floor
Chicago, Illinois 60603

Mr. Andrew Eulass
Due Process Coordinator
Illinois State Board of Education
100 North First Street
Springfield, Illinois 62777-0001

before 6:00 p.m. on February 4, 2008.

Mary Schwartz
Due Process Hearing Officer
6116 S. University Avenue, 2N
Chicago, Illinois 60637
773.684.3035(voice & facsimile)
708.912.0755 (cellular)
maryschwartz@gmail.com

Ex. B

**Detailed Time Record for 2007-1431/Walls page 1**

| | | Time | Date | Last Name | First Name | Description |
|---|---|---|---|---|---|---|
| | | 2.6 | 7/17/2007 | Shapiro | Rachel | 2.0 reviewed extensive private eval, .1 spoke with PO, .5 spoke with dad re private evaluation |
| | | 1.1 | 7/18/2007 | Shapiro | Rachel | .2 organized file, .9 began working on due process request |
| | | 2.1 | 7/19/2007 | Shapiro | Rachel | 1.8 worked on due process letter,.3 reviewed eval |
| | | 2.3 | 7/20/2007 | Shapiro | Rachel | .5 spoke with probation officer a number of times re status of due process and factual information for due process letter, 1.8 worked on due process request |
| | | 0.7 | 7/23/2007 | Shapiro | Rachel | .2 spoke with dad re scheduling meeting, .5 wrote retainer |
| | | 0.2 | 7/24/2007 | Pribyl | Olga | review and revise retainer |
| | | 2.3 | 7/24/2007 | Shapiro | Rachel | 1.7 worked on due process letter, .3 spoke with probation officer re dissent at previous IEP, .3 went through most recent IEP |
| | NC | 0.2 | 7/24/2007 | Shapiro | Rachel | conf djw re due process letter djw was going to edit |
| | NC | 0.2 | 7/24/2007 | Wysong | Debra | conf rls re due process letter dw to edit |
| | | 0.5 | 7/25/2007 | Shapiro | Rachel | .1 left vm for dad re not showing up with appointment, .4 spoke with Buford (probation) a few times re him taking family to EFE for appointment |
| | | 0.1 | 7/25/2007 | Shapiro | Rachel | conf djw re appointment for retainer -strategizing |
| | | 0.1 | 7/25/2007 | Wysong | Debra | conf rls re appintment for retainer - strategizing |
| | | 0.3 | 7/26/2007 | Wakelin | Margie | Research  Ed Malpractice |
| | NC | 0.3 | 7/26/2007 | Wysong | Debra | dp letter editing |
| | | 0.6 | 7/27/2007 | Pribyl | Olga | review and revise due process request. |
| | | 0.8 | 7/27/2007 | Wakelin | Margie | Research Ed Malpractice |

**Detailed Time Record for 2007-1431/Walls page 2**

| | | | | | | |
|---|---|---|---|---|---|---|
| | | 0.5 | 7/30/2007 | Shapiro | Rachel | .2 finished due process letter with DW and OP's edits, .1 spoke with Buford (probation officer) re getting family to office, .2 spoke with Petrina re coming into office |
| | | 0.2 | 7/31/2007 | Shapiro | Rachel | tried Petrina and Melvin a few times |
| | | 1 | 8/1/2007 | Shapiro | Rachel | .9 spoke with Donna and Buford (probation officers) a few times re getting Petrina into office, private eval's contents and re adding reimbursement claim for private eval, .1 tried Petrina and Melvin |
| | | 2.8 | 8/2/2007 | Shapiro | Rachel | .2 spoke with Buford (probation officer) numerous times re bringing in Petrina, 2.4 met with Petrina to sign release/retainer, discuss private school, .2 filed for due process and t/c w/DJW re due process request |
| | | 1.1 | 8/2/2007 | Wakelin | Margie | Research and write up about educational malpractice |
| | | 0.2 | 8/2/2007 | Wysong | Debra | tf: rls re Eulass contact information at ISBE for dp request |
| | | 0.7 | 8/3/2007 | Shapiro | Rachel | .4 spoke with evaluator Dr. Cheri Laapari re willingness to testify, .1sent out email to sp ed clinic re Dr. Laapari, .1spoke with CPS re due process request, .1 re-emailed request |
| | NC | 0.3 | 8/3/2007 | Wakelin | Margie | Faxed due process request to CPS for Rachel |
| | | 0.1 | 8/7/2007 | Shapiro | Rachel | emailed CPS re mediation date availability |
| | | 0.2 | 8/9/2007 | Shapiro | Rachel | t/c with Sherry Colegrove, ISBE re mediation and re due process case in state system |
| | | 0.2 | 8/9/2007 | Shapiro | Rachel | conf rls re ISBE's lack of hearing officer appt discussed strategy to respond w/OP and DJW |
| | | 0.2 | 8/9/2007 | wysong | Debra | conf rls re lack of hearing officer appt discussed strategy to respond |

**Detailed Time Record for 2007-1431/Walls page 3**

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| | | 0.2 | 8/10/2007 | Shapiro | Rachel | spoke with Mary at ISBE due process re CPS's lack of reply to our due process complaint |
| | | 0.1 | 8/20/2007 | Wysong | Debra | additional school documents received and provided to rls |
| | | 0.2 | 8/20/2007 | Wysong | Debra | letter from ISBE re hearing, hearing officer hearing officer appointed |
| | | 0.1 | 8/21/2007 | Shapiro | Rachel | emailed djw re status of case |
| | | 0.3 | 8/22/2007 | Shapiro | Rachel | emails from hearing officer and CPS re mediation dates |
| | | 0.1 | 8/22/2007 | Wysong | Debra | email and reply rls re mediation |
| | | 2 | 8/27/2007 | Shapiro | Rachel | .2 spoke with Buford (probation officer) re mediation date,.1 left vm for Petrina re same,.2 emailed with hearing officer and CPS re status and mediation dates,.1 left vm for Donna Neal (probation officer) re mediation, 1.5 organized and reviewed docs received from CPS |
| | | 0.1 | 8/28/2007 | Wysong | Debra | emls rls re hearing planning |
| | | 1.1 | 8/29/2007 | Shapiro | Rachel | .1 spoke with Buford (probation officer) re talking to dad, .1 spoke with P's dad re due process request, .3 reviewed speech and language evaluation, .1 began draft of letter to CPS re IEE; .5 conference with DJW re due process and mediation, assessing case and strategy |
| | | 0.5 | 8/29/2007 | Wysong | Debra | conf rls re dp and mediation assessing case determining strategy options |
| | | 2.2 | 8/30/2007 | Shapiro | Rachel | .5 spoke with Petrina and Buford (probation) numerous times re Acacia and release,  1.7 drafted letter to CPS re request for IEE and district's response to our due process complaint |
| | | 0.1 | 8/30/2007 | Shapiro | Rachel | conf djw re releases needed |
| | | 0.2 | 8/30/2007 | Shapiro | Rachel | spoke with djw re IEE letter, |
| | | 0.1 | 8/30/2007 | Wysong | Debra | t/c Acacia re PW's possible placement |

**Detailed Time Record for 2007-1431/Walls page 4**

| | | | | | | |
|---|---|---|---|---|---|---|
| | | 0.1 | 8/30/2007 | Wysong | Debra | emsl re acacia has no record of anyone req. placement for PW |
| | | 0.1 | 8/30/2007 | Wysong | Debra | conf rls re releases needed |
| | | 0.2 | 8/30/2007 | Wysong | Debra | conf rls re IEE letter and cps response to IEE req in due process letter |
| | | 1.7 | 9/4/2007 | Shapiro | Rachel | .3 emails with hearing officer & CPS re hearing dates, .1 left vm for potential expert re testifying, .4 spoke with Probation officers re mediation, .4 spoke with Acacia's asst principal re P's possible admission, .5 edited and sent letter re IEE to conference w/CPS |
| | | 0.7 | 9/4/2007 | Shapiro | Rachel | conf djw re update issues and hearing prep |
| | | 0.1 | 9/4/2007 | Shapiro | Rachel | conf djw re hearing dates |
| | | 0.1 | 9/4/2007 | Wysong | Debra | conf rls re hearing dates |
| | | 0.1 | 9/4/2007 | Wysong | Debra | elm re dp prep |
| | | 0.3 | 9/4/2007 | Wysong | Debra | editing IEE |
| | | 0.7 | 9/4/2007 | Wysong | Debra | conf rls re update and hearing prep |
| | | 0.5 | 9/5/2007 | Contreras | Daniel | Conf. w/RLS and DJW re due process request, procedural history, and strategies |
| | | 0.2 | 9/5/2007 | Pribyl | Olga | discuss with Barry needed fee approval for experts. Advise Rachel of approval for the same. |
| | | 2 | 9/5/2007 | Shapiro | Rachel | .8 spoke with Melvin (dad) re mediation strategy Fri, .1 left vm for probation officer re mediation plans, .1 emailed CPS re mediation location, .5 spoke to both experts re testifying and potential times/dates that work for them, .5 discussed case w/DC and DJW re due process request and procedural history, as well as strategy |
| | | 0.5 | 9/5/2007 | Wysong | Debra | conf dc, rls, op re req. and procedureal history |
| | | 0.3 | 9/6/2007 | Pribyl | Olga | discuss with Rachel tomorrow's meeting and strategy |

**Detailed Time Record for 2007-1431/Walls page 5**

| | | | | | | |
|---|---|---|---|---|---|---|
| | | 1.5 | 9/6/2007 | Shapiro | Rachel | 1.2 mediation prep, .3 spoke with dad re mediation |
| | | 0.4 | 9/6/2007 | Wakelin | Margie | P. W research into life coach |
| | | 0.2 | 9/6/2007 | Wysong | Debra | audiologist evaluation emails |
| | | 7.5 | 9/7/2007 | Contreras | Daniel | Mediation at Tilden HS w/ RLS + travel |
| | | 0.4 | 9/7/2007 | Pribyl | Olga | confer with Rachel re today's meeting, settlement offer, client's perspective and next strategy. |
| | | 0.4 | 9/7/2007 | Shapiro | Rachel | .4 confer with OP re today's meeting, settlement offer, client's perspective and next strategy. |
| | | 10.7 | 9/7/2007 | Shapiro | Rachel | 9.2 Petrina mediation prep, attended mediation, discussion with Petrina and father after mediation (including calls with DJW),  1.5 drafted letter to CPS re settlement |
| | | 1.2 | 9/7/2007 | Wysong | Debra | rls at mediation w/ cps now -calling to discuss offer, response, counter offer, arguments etc multiple calls |
| | | 0.9 | 9/10/2007 | Shapiro | Rachel | .5 worked on letter for CPS re mediation; .4 t/c with DJW re mediation and letter to CPS |
| | | 0.4 | 9/10/2007 | Wysong | Debra | t/c rls re mediation and response discussing letter to cps- multiple calls |
| | | 0.3 | 9/11/2007 | Contreras | Daniel | Conf RLS regarding letter (settlement offer) to Tracy |
| | | 2.5 | 9/11/2007 | Pribyl | Olga | several discussions/emails with Rachel. Review and revise settlement agreement/demand letter. Discuss pros and cons of case with Rachel. |
| | | 4.4 | 9/11/2007 | Shapiro | Rachel | 2.5 preparation of prehearing documents, .8 edited and sent letter to CPS with counter-offer for settlement, .3 spoke with P re settlement offer, .3 spoke with DJW, DC, and OP re settlement offer; .2 t/c re mediation, offer and EFE's response via email |
| | | 0.1 | 9/11/2007 | Wysong | Debra | email re prehearing docs |

**Detailed Time Record for 2007-1431/Walls page 6**

| | | | | | | |
|---|---|---|---|---|---|---|
| | | 0.2 | 9/11/2007 | Wysong | Debra | t/c rls re mediation offer and efe's response via letter |
| | NC | 0.3 | 9/11/2007 | Wysong | Debra | rls, dc, op re settlement offer |
| | NC | 0.3 | 9/11/2007 | Wysong | Debra | W t/c re mediation letter |
| | | 3.4 | 9/12/2007 | Shapiro | Rachel | worked on all pre-hearing documents (1.0 including prehearing statement, .5 stipulations, 1.0 witness list |
| | | 0.1 | 9/12/2007 | Wysong | Debra | email re  prehearing |
| | NC | 0.2 | 9/13/2007 | Contreras | Daniel | Conf DJW regarding prehearing |
| | | 0.3 | 9/13/2007 | Pribyl | Olga | calls and emails with Karen, DJW and Rachel on Karen's preparation of parent document submission for hearing |
| | | 0.6 | 9/13/2007 | Shapiro | Rachel | discussed document list with DJW |
| | NC | 0.2 | 9/13/2007 | Wysong | Debra | conf DC re prehearing |
| | | 0.7 | 9/13/2007 | Wysong | Debra | W document list review |
| | | 0.6 | 9/13/2007 | Wysong | Debra | discussed rls prehearing docs |
| | | 1.3 | 9/17/2007 | Pribyl | Olga | review and revise prehearing statement and prehearing witness list.  Confer with Rachel and DJW re changes to both and questions on the same. |
| | | 4 | 9/17/2007 | Shapiro | Rachel | 3.8 worked on prehearing documents, 0.2spoke with DJW re docs for hearing |
| | | 1 | 9/17/2007 | Wysong | Debra | 0.2 t/c rls  re documents for hearing (0.7)editing docs for prehearing, .1 t/c email re lapaari evaluation |
| | | 0.2 | 9/18/2007 | Pribyl | Olga | emails on attorney's fee issue for prehearing. |
| | | 4.2 | 9/18/2007 | Shapiro | Rachel | .3 prep for pre-hearing, 1.7pre-hearing, .9 discussed witness testimony and schedule with DJW, .7 spoke with expert, Dr. Laaperi, re hearing dates and testimony (with DJW), .6 worked on draft of memo with specificity requested by hearing officer |

**Detailed Time Record for 2007-1431/Walls page 7**

| | | | | | | |
|---|---|---|---|---|---|---|
| | | 0.2 | 9/18/2007 | Wysong | Debra | conf re opposing counsel request at prehearing |
| | | 3.4 | 9/18/2007 | Wysong | Debra | 1.7 prehearing .7, t/c Lapaari with rls re hearing prep and dates, .9 conf rls and .1 emls to cps, then to hearing officer re witness testimony schedule |
| | | 3.6 | 9/19/2007 | Shapiro | Rachel | .4 spoke with Dr. Laaperi a few times re her writing letter re CPS 2006 eval, 3.1 worked on memo as requested by hearing officer regarding clarification of issues and remedies, .1 conversation w/DJW re clarification of issues |
| | | 1.5 | 9/19/2007 | Shapiro | Rachel | conf DJW re lapaari report and clarification of issues and remedies |
| | | 1.5 | 9/19/2007 | Wysong | DJWra | confs rls re lapaari her report and clarification of issues and remedies that hearing officer requested |
| | NC | 7.5 | 9/21/2007 | Contreras | Daniel | at Tilden HS for W's IEP meeting, with RLS + travel |
| | | 6 | 9/21/2007 | Shapiro | Rachel | IEP meeting, entered notes into document management system re meeting |
| | | 0.2 | 9/21/2007 | Shapiro | Rachel | t/c DJW re stayput |
| | | 0.2 | 9/21/2007 | Wysong | Debra | tvm and t/c rls re stayput |
| | | 3.8 | 9/24/2007 | Shapiro | Rachel | 3.1 worked on memo with specifics requesetd by hearing officer, .4 discussed memo with DJW and OP,.1 left vm for probation officers re Acacia, .1 left vm for Petrina re same, .1 spoke with Buford (probation officer) re Acacia |
| | NC | 0.9 | 9/24/2007 | Wysong | Debra | .5 reviewing memo for W clarification of issues and remedies, .4 t/c discussing memo with rls |
| | | 1.4 | 9/25/2007 | Pribyl | Olga | review and revise response to hearing officer request for specificity on certain issues and request for relief. Emails with Rachel re the same. |

**Detailed Time Record for 2007-1431/Walls page 8**

| | | | | | | |
|---|---|---|---|---|---|---|
| | | 5.9 | 9/25/2007 | Shapiro | Rachel | 5.1 wrote, edited and finished memo requested by hearing officer, .2 emailed CPS re dissent to IEP, .3 spoke with Buford (probation) and Melvin (dad) re Acacia, .1 discussed Acacia's appropriateness for Petrina with Margie, .2 directions for meeting |
| | | 0.1 | 9/25/2007 | Shapiro | Rachel | discussed w/ djw re W memo |
| | | 0.1 | 9/25/2007 | Shapiro | Rachel | t/c djw re P IEP -cps would not write in name of school - acacia in iep rls to send letter to CPS may need to amend issues to clarify if acacia isn't granted |
| | | 0.1 | 9/25/2007 | Wysong | Debra | t/c rls re P IEP -cps would not write in name of school - acacia in iep - rls to send letter to SAS may need to amend issues to clarify if acacia isn't granted |
| | | 0.2 | 9/25/2007 | Wysong | Debra | discussed w/ rls re W memo.1, Dr. ferre report .1, |
| | | 0.5 | 9/25/2007 | Wysong | Debra | editing memo re clarifying issue and remedies |
| | NC | 0.1 | 9/25/2007 | Wakelin | Margie | conf rls re Acacia visit and appropriateness for P |
| | | 5.4 | 9/26/2007 | Shapiro | Rachel | 5.0 went to Acacia with Petrina (visit and travel time), .1 spoke with Buford (probation) re Acacia, .1 emailed Donna (probation) re Acacia, .2 emails with CPS re Acacia |
| | | 4.3 | 9/27/2007 | Shapiro | Rachel | worked on response to CPS' Motion to Strike Relief - researched and wrote first draft |
| | | 0.4 | 9/27/2007 | Shapiro | Rachel | t/c DJW visit to acacia and cps motion to strike .2, 2nd t/c DJW cps motion to strike and cps argument re psychologist must be on state approved list. |
| | | 0.4 | 9/27/2007 | Wysong | Debra | t/c rls re visit to acacia and sd motion to strike.2, 2nd t/c  sd motion to strike and response to cps argument re pscyh must be on state approved list - not true.2 |

**Detailed Time Record for 2007-1431/Walls page 9**

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| | | | 3.9 | 10/1/2007 | Shapiro | Rachel | 3.4 worked on response to CPS' motion to strike remedies and .5 table of cases/law |
| | | | 0.5 | 10/1/2007 | Shapiro | Rachel | conf djw re response to CPS' motion to strike |
| | | | 0.5 | 10/1/2007 | Wysong | Debra | conf  rls re response to CPS' motion to strike |
| | | | 3.7 | 10/2/2007 | Shapiro | Rachel | edited response to CPS motion to strike remedies |
| | | | 2.3 | 10/2/2007 | Pribyl | Olga | review and finalize response to motion to strike |
| | | | 0.1 | 10/3/2007 | Shapiro | Rachel | reviewed due process information from hearing officer |
| | | | 0.2 | 10/4/2007 | Shapiro | Rachel | spoke with Petrina re health status |
| | | | 0.3 | 10/5/2007 | Shapiro | Rachel | vm from Buford (probation officer), faxed IEP to Buford |
| | | | 0.1 | 10/8/2007 | Shapiro | Rachel | emailed CPS re status of case |
| | NC | | 0.2 | 10/16/2007 | Contreras | Daniel | with RLS re telephone call w/ Probation officer |
| | | | 0.3 | 10/16/2007 | Shapiro | Rachel | .1 left vm for Buford (probation) and Petrina re Acacia placement and informed DC, .1 left vm for Virginia Johnson (CPS placement office) re same, .1 reviewed hearing officer's decision on CPS' motion to strike |
| | | | 0.7 | 10/17/2007 | Shapiro | Rachel | .4 spoke with Probation officers, .1 tried to get ahold of Petrina..2 discussed with DC |
| | | | 0.7 | 10/18/2007 | Shapiro | Rachel | .4 numerous emails with Virginia Johnson (CPS placement office) and CPS re placement at Acacia, .1 vm for Buford (probation) re same, .2 letter to dad re calling me |
| | | | 0.4 | 10/19/2007 | Shapiro | Rachel | .2 spoke with Petrina re Acacia placement and transportation, .2 discussed same issues with Buford (probation officer) |
| | | | 0.2 | 10/22/2007 | Shapiro | Rachel | .1 discussed status with DJW,.1 spoke with Petrina re Acacia |
| | | | 0.1 | 10/22/2007 | Wysong | Debra | conf rls re update of case and PW status re acacia |

**Detailed Time Record for 2007-1431/Walls page 10**

| | | | | | | |
|---|---|---|---|---|---|---|
| | | 0.1 | 10/23/2007 | Shapiro | Rachel | left vm for Acacia re Petrina |
| | | 0.6 | 10/30/2007 | Shapiro | Rachel | .4 spoke with P and her dad re ongoing placement issues, .1 emailed CPS re same, .1 emailed hearing officer re hearing |
| | | 0.7 | 10/31/2007 | Shapiro | Rachel | .2 spoke with Buford (probation) re Acacia, .1 spoke with bus co re transportation starting soon, .1 spoke with Petrina and dad re bus co, .1 emails with CPS re transportation, .2 spoke with acacia re same |
| | | 0.4 | 11/1/2007 | Shapiro | Rachel | .3 spoke with dad and with Acacia re bus issues (still unresolved), .1 clarified five day rule with hearing officer and CPS |
| | | 0.2 | 11/2/2007 | Shapiro | Rachel | spoke with bus co and dad re transportation issues |
| | | 1.4 | 11/5/2007 | Shapiro | Rachel | worked on direct for Petrina, worked on opening statement |
| | | 0.2 | 11/7/2007 | Shapiro | Rachel | left vm for dad a few times regarding Petrina's first day at school |
| | | 0.2 | 11/12/2007 | Contreras | Daniel | discussed due process hearing w/Rachel |
| | | 0.2 | 11/12/2007 | Shapiro | Rachel | discussed due process hearing w/DC |
| | | 3.9 | 11/13/2007 | Shapiro | Rachel | 3.0 worked on document list (prepared documents), .1 vm from Buford (probation officer) re Petrina's attendance, .2 spoke w/Petrina's dad re attendance, .2 discussed doc list with DJW |
| | | 0.2 | 11/13/2007 | Wysong | Debra | conf rls and kh re doc list |
| | | 0.3 | 11/14/2007 | Shapiro | Rachel | .1 talked w/Buford (probation officer) re Petrina's attendance, .1 emails with hearing officer, .1 tried to call Petrina |
| | | 2.2 | 11/15/2007 | Contreras | Daniel | conf w RLS and DJW re hearing prep re witnesses, order and document lists |

**Detailed Time Record for 2007-1431/Walls page 11**

| | | | | | | |
|---|---|---|---|---|---|---|
| | | 5.8 | 11/15/2007 | Shapiro | Rachel | 3.6 worked on document lists, 2.2 discussed witnesses, order of witnesses, document questions, other hearing prep with DC and DJW |
| | | 2.2 | 11/15/2007 | Wysong | Debra | document questions, t/c and emls w/ rls and dc, hearing prep including witnesses and witness order |
| | | 0.2 | 11/16/2007 | Shapiro | Rachel | spoke with Buford (probation) re attendance |
| | | 4.8 | 11/19/2007 | Shapiro | Rachel | 3.0 worked on document list; .8 prepared list of witnesses, numerous email with CPS re witness order, .3 spoke with experts re dates for testifying, .2 spoke with probation re Petrina's attendance, .4 strategize order of witnesses with DW and discussed alternate sites; .1 t/c DW re witness scheduling |
| | | 0.2 | 11/19/2007 | Wysong | Debra | t/c rls re witness scheduling for hearing, multiple emls re witnesses and hearing prep |
| | | 0.9 | 11/19/2007 | Wysong | Debra | t/c witness order notifying cps that all 4 days needed for parents case, discussing alternate site |
| | | 7.3 | 11/20/2007 | Shapiro | Rachel | 1.5 prepared doc list,.2 emails re doc book, .4 spoke w/Petrina & dad,.5 spoke with Donna Neal (probation) re testimony, .5 spoke with Petrina's teacher Jessica Connor re testimony, 3.9 worked on directs of Donna, Petrina, Ms. Knott, .2 spoke with CPS re witness order, .6 worked on proposed statement of facts |
| | | 2 | 11/21/2007 | Shapiro | Rachel | .5 worked on direct for Petrina's teacher .5 worked on proposed findings of fact, .2 spoke with CPS re witnesses, .8 worked on opening statement |
| | | 0.1 | 11/21/2007 | Wysong | Debra | email re hearing prep; expert scheduling, relief |

**Detailed Time Record for 2007-1431/Walls page 12**

| | | | | | | |
|---|---|---|---|---|---|---|
| | | 0.3 | 11/21/2007 | Wysong | Debra | witness prep scheduling email Jan marden Johnson, vm attempted for dr. ferre not accepting vm, and elm rls re status |
| | NC | 0.3 | 11/26/2007 | Contreras | Daniel | discussed W case with Rachel |
| | | 0.7 | 11/26/2007 | Pribyl | Olga | confer with Rachel re status of hearing and witness examination. emails re needed support staff for document prep since Karen is out.confer with Cecile re the same.emails to everyone on case to schedule meeting to discuss when witnesses and case. |
| | | 1.2 | 11/26/2007 | Pribyl | Olga | meet with Rachel again to discuss subpoenas, witness order, school's case and witnesses, meeting with ho on Wednesday.emails to everyone follow-up.conf with Rachel on new report found by cps |
| | | 8.6 | 11/26/2007 | Shapiro | Rachel | .6  work on Ms. Bullock's direct.1 left vm for Donna (probation), .3 emails with CPS re witnesses and talked to CPS re same, 2.8 worked on doc prep, 1.0 worked on direct of Ms. Bullock, .3 discussed case w/DC, OP, .9 t/c DJW re authenticating documents with witness and witness documents .2 wrote letter to Petrina's dad re hearing, .5 worked on opening, .7 met with OP re status of hearing and witness examination, 1.2 met with OP re subpeonas, witness order, school's case and witnesses, and meeting with hearing officer on Wed |
| | | 0.4 | 11/26/2007 | Wysong | Debra | emails re W hearing prep witness arrangements |
| | | 0.9 | 11/26/2007 | Wysong | Debra | t/c rls re: going through witnesses docs reviewing how to authenticate |
| | | 4.5 | 11/27/2007 | Contreras | Daniel | worked on directs of V.Stewart (CPS staff) and J.Curtis (CPS staff) |

**Detailed Time Record for 2007-1431/Walls page 13**

| | | | | | | |
|---|---|---|---|---|---|---|
| | | 4 | 11/27/2007 | Pribyl | Olga | emails re case. .2Conf with Rachel and then Rachel and DJW to discuss hearing issues and hearing officer's meeting. Advise of steps to take with respect to the prehearing meeting.review Rachel's findings, opening and witness examinations.make changes/comment |
| | | 6.8 | 11/27/2007 | Shapiro | Rachel | .2 emails with CPS and hearing officer re meeting on Wed, .7 worked on subpoenas, 4.0 worked on direct of Ms. Bullock and Ms. Jackson-Hill (CPS staff), .5 met with Margie re her direct, .5 organized document list, .2 discussed doc prep with Karen, .2 conf OP and DJW re hearing officer meeting and hearing issues, .5 t/c DJW re document books, new CPS documents and new witnesses |
| | | 4.5 | 11/27/2007 | Wakelin | Margie | Drafted/Revised directs of Reading Specialist |
| | | 0.1 | 11/27/2007 | Wysong | Debra | tvm dr. ferre |
| | | 1.2 | 11/27/2007 | Wysong | Debra | 1.0 researching closing .2 t/c op and rls re hearing officer meeting and hearing issues |
| | | 1.6 | 11/27/2007 | Wysong | Debra | .5 t/c rls re W doc book witness order new docs Tracy just found and new witnesses discussing who would cross/direct, .1 tvm ferre, .1 tvm kupperman at csld, .8 researching comp ed .1muitiple emails re hearing prep |
| | NC | 0.3 | 11/28/2007 | Contreras | Daniel | conf w/ OP and RLS re format/style/content of directs |
| | | 3.5 | 11/28/2007 | Contreras | Daniel | reviewed educational records of W and worked on directs of V.Stewart and J.Curtis |

**Detailed Time Record for 2007-1431/Walls page 14**

| | | | | | | |
|---|---|---|---|---|---|---|
| | | 3.6 | 11/28/2007 | Pribyl | Olga | 3.2 meet w/ Rachel to go over factual findings,opening and direct examinations of all of Rachel's witnesses. .3rev DC's exam and discuss with him. .1 answer Margie's general questions.answer everyone's questions. |
| | | 1.8 | 11/28/2007 | Shapiro | Rachel | 1.6 docs and witness list organization, .2 t/cDW re Ferre's testimony |
| | | 8 | 11/28/2007 | Shapiro | Rachel | 1.2 meeting with hearing officer and CPS, 3.2 worked on numerous directs for hearing prep, 3.6 discussed hearing issues w/Margie, DJW, OP (3.2 w/ OP), and DC (.3 w/DC), discussed opening, directs, etc |
| | | 0.6 | 11/28/2007 | Wysong | Debra | .2 hearing prep conf rls re goals for ferre, .4  drafting direct for Dr. Ferre |
| | | 1.5 | 11/28/2007 | Wysong | Debra | .1 conf rls re witnesses scheduling 2 still have not returned calls, tvm ferre, tvmf Phyllis kupperman, rt/c kupperman, conf disc acacia, and what her company offers re speech language social group services |
| | | 1.2 | 11/28/2007 | Wysong | Debra | meeting with hearing officer and Tracy at CPS to discuss hearing per hearing officer's request |
| | | 1.1 | 11/28/2007 | Wysong | Debra | prep Dr. ferre for hearing |
| | | 1.9 | 11/29/2007 | Pribyl | Olga | .3review Margie's witness exam and questions-email/confer with her re the same. 1.5numerous emails and calls with Rachel and DJW re witness, duplication of testimony, authentication of documents, expert info and other quest |
| | | 2 | 11/29/2007 | Shapiro | Rachel | 1.2 worked on directs, crosses, findings of fact, etc, .2 emails with CPS,.3  discussed DJW's conversation and review of testimony w/Jan Marsden-Johnson, .3 t/c w/DJW re hearing officer's request for specificity |

**Detailed Time Record for 2007-1431/Walls page 15**

| | | | | | | |
|---|---|---|---|---|---|---|
| | | 8 | 11/29/2007 | Shapiro | Rachel | 1.0 multiple emails with MW, DW, OP re hearing prep and hearing directs, .2 spoke with dad re hearing, went over testimony with Jessica O'Connor & P, 1.0 worked on opening,4.3 worked on  directs for Bullock, Jackson Hill (CPS staff), Petrina, Jessica O'Connor, worked on crosses of CPS staff, 1.0 proposed findings of fact, .5 met with DJW and OP re hearing details, questions for witnesses, other questions re directs, crosses, and findings of fact |
| | | 0.3 | 11/29/2007 | Wysong | Debra | hearing prep emails |
| | | 0.5 | 11/29/2007 | Wysong | Debra | discussed w/ rls, op hearing details what to ask witnesses, documents for each witness, other questions re directs, crosses, findings of fact |
| | | 5.6 | 11/29/2007 | Wysong | Debra | .1 tvm Jan Marsden-Johnson, .3 t/c rls re hearing officer request for specificity, 5.2 drafting directs and Johnson prep |
| | | 1 | 11/30/2007 | Contreras | Daniel | conf with RLS + DJW re hearing prep and to review concerns |
| | | 0.9 | 11/30/2007 | Contreras | Daniel | met with OP, DJW, RLS re upcoming W due process hearing and to review concerns |
| | | 3.6 | 11/30/2007 | Contreras | Daniel | prep for W hearing |
| | | 2.1 | 11/30/2007 | Pribyl | Olga | review revised opening and give Rachel feed back on the same. Answer questions on case, hearing and strategy dw and dc.review ferre direct and make comments on the same. Review gen ed exams and make comments on the same. |

**Detailed Time Record for 2007-1431/Walls page 16**

| | | | | | | |
|---|---|---|---|---|---|---|
| | | 2.7 | 11/30/2007 | Shapiro | Rachel | .9 discuss with OP, DC and DJW hearing prep &reviewing our concerns, .1 t/c DJW re my directs, 1.8 reviewing docs with DJW and part with DC to determine which witness is responsible for admitting doc and what ques might be asked |
| | | 8 | 11/30/2007 | Shapiro | Rachel | 4.0 worked on many directs (CPS staff and our experts), 1.5 worked on crosses of CPS staff, 1.0 worked on authentication of documents, 1.5 discussed multiple issues w/DW, OP, DC |
| | | 0.9 | 11/30/2007 | Wysong | Debra | Johnson direct drafting |
| | | 1.1 | 11/30/2007 | Wysong | Debra | direct ferre |
| | | 1.9 | 11/30/2007 | Wysong | Debra | Lapaari prep discussing evaluation, conf op, conf and t/c w/ rls re hearing prep |
| | | 5.5 | 11/30/2007 | Wysong | Debra | 1.1 +1.7 Marsden Johnson direct, .9 met with op, rls, and dc re hearing prep reviewing concerns, .1 t/c rls re her directs, 1.8 reviewing docs with rls part with dc too to determine which witness is resp for admitting doc and what ques might be asked |
| | | 4.9 | 12/1/2007 | Pribyl | Olga | review direct and cross of witnesses (Marsden-johnson, ferre, knott, bullock, attendance officer) and email comments to respective attorneys.answer questions about at, dissent, and introduction of past ieps. |
| | NC | 2.4 | 12/1/2007 | Shapiro | Rachel | 2.4 reviewed evidence rules |
| | | 2.5 | 12/1/2007 | Shapiro | Rachel | W hearing prep, 2.0 worked on Ms. Bullock's direct questions .5 opening, |
| | | 0.3 | 12/1/2007 | Wysong | Debra | email re hearing closing |
| | | 0.4 | 12/2/2007 | Pribyl | Olga | review Curtis exam and email comments to DC. |
| | | 4.2 | 12/2/2007 | Shapiro | Rachel | 3.8 final hearing prep, .4 t/c with DJW re hearing officer's saying closing should be done on 1/4/08 |

**Detailed Time Record for 2007-1431/Walls page 17**

| | | | | | | |
|---|---|---|---|---|---|---|
| | NC | 0.4 | 12/2/2007 | Wysong | Debra | t/c rls re hearing officer now saying she wants closing on the 4th |
| | NC | 7.5 | 12/3/2007 | Contreras | Daniel | attended due process hearing |
| | | 7.4 | 12/3/2007 | Pribyl | Olga | hearing prep and attend hearing. |
| | | 5.2 | 12/3/2007 | Shapiro | Rachel | due process hearing prep prior to hearing and after hearing - went over that day's directs and worked on direct for Petrina's teacher from Acacia and CPS staff |
| | NC 6 | 7.5 | 12/3/2007 | Shapiro | Rachel | P's due process hearing (direct of Petrina) |
| | | 0.2 | 12/3/2007 | Wysong | Debra | email re witnesses |
| | | 2.7 | 12/3/2007 | Wysong | Debra | drafting directs for cps psychologists |
| | NC 1.5 | 7.5 | 12/3/2007 | Wysong | Debra | due process hearing directs of Dr. marsden Johnson expert,  and J Schwartz CPS staff |
| | | 3.9 | 12/4/2007 | Contreras | Daniel | prepared direct of V.Stewart |
| | | 9.9 | 12/4/2007 | Pribyl | Olga | travel to and from hearing. Attend hearing |
| | NC 6 | 12 | 12/4/2007 | Shapiro | Rachel | hearing, travel time (direct of Ms. Jackson-Hill and Ms. Knott) |
| | NC | 6 | 12/4/2007 | Wakelin | Margie | Attended due process hearing; |
| | NC 6 | 12.5 | 12/4/2007 | Wysong | Debra | due process hearing ferre most of AM and lopez in PM |
| | | 4 | 12/5/2007 | Contreras | Daniel | prepared direct of J.Curtis |
| | n/c | 1.9 | 12/5/2007 | Pribyl | Olga | review attendance records to see if I can come up with some questions. Review numerous emails on control group. Review Margie's cross and see what can add for attendance person.discuss with Barry status of hearing, .4 conf rachel re witness testimony |
| | | 0.4 | 12/5/2007 | Shapiro | Rachel | juvenile court act research |

**Detailed Time Record for 2007-1431/Walls page 18**

| | | | | | | |
|---|---|---|---|---|---|---|
| | | 8 | 12/5/2007 | Shapiro | Rachel | 4.1 worked on multiple directs, 2.0 researched privilege issue, .4 discussed witness testimony w/OP, .9 spoke with DJW re hearing prep, witnesses and scheduling,.6  talked with Donna Neal (probation) |
| | | 0.9 | 12/5/2007 | Wysong | Debra | t/c rls re hearing prep witnesses for next two days, discussing previous days testimony, discussing witness for Jan and scheduling |
| | NC 7.7 | 11.7 | 12/6/2007 | Contreras | Daniel | 4.0 Doing directs/crosses/redirects at W Hearing of Vivian Steward and Jennifer Curtis.  7.7 Observed due process hearing + travel to and from hearing |
| | | 9.8 | 12/6/2007 | Pribyl | Olga | review juv. Ct act. Emails today's hearing and privilege objections, etc. travel to and from hearing. Attend hearing. |
| | NC 4 | 12.5 | 12/6/2007 | Shapiro | Rachel | Petrina's due process hearing (CPS staff, probation officer Donna Neal, and Jessica Connor (Acacia teacher) direct exam), prep for following days witnesses |
| | NC | 11.9 | 12/6/2007 | Wysong | Debra | due process hearing |
| | NC | 4.5 | 12/6/2007 | Wakelin | Margie | Attended due process hearing because Attendance Officer and Reading Specialist were on the agenda; however, did not get to do those examinations because of time |
| | | 11.2 | 12/7/2007 | Pribyl | Olga | travel to and from hearing. Attend hearing |
| | NC 3 | 11.4 | 12/7/2007 | Shapiro | Rachel | due process hearing (direct of Ms. Wilcoxsin- Davis (CPS staff) |
| | NC 1.75 | 4.75 | 12/7/2007 | Wakelin | Margie | Attended due process hearing; conducted direct of attendance officer |
| | NC | 11.9 | 12/7/2007 | Wysong | Debra | due process hearing |

**Detailed Time Record for 2007-1431/Walls page 19**

| | | | | | | |
|---|---|---|---|---|---|---|
| | NC | 1.3 | 12/10/2007 | Shapiro | Rachel | .2 talked with OP and DW re hearing testimony, .5 cleaned up the file,.6 cleaned up papers from all over the desk and organized info |
| | | 0.2 | 12/10/2007 | Pribyl | Olga | talked with rachel and deb re hearing testimony |
| | | 0.2 | 12/10/2007 | Wysong | Debra | talked with OP and RLS re hearing testimony |
| | | 0.2 | 12/11/2007 | Shapiro | Rachel | spoke with Petrina re status of case |
| | | 0.2 | 12/14/2007 | Shapiro | Rachel | .1 discussed hearing with DJW, .1 spoke with Buford (probation officer) re same |
| | | 0.1 | 12/14/2007 | Wysong | Debra | discussed hearing with rls |
| | | 0.1 | 12/17/2007 | Shapiro | Rachel | talked to DJW re transcript motion |
| | | 3.7 | 12/17/2007 | Wysong | Debra | motion for transcripts drafting, .1 conf rachel re motion for transcripts |
| | | 0.6 | 12/18/2007 | Wysong | Debra | research for transcript motion |
| | | 1.4 | 12/19/2007 | Shapiro | Rachel | additional research transcript case law/statutes |
| | NC | 0.3 | 12/20/2007 | Shapiro | Rachel | worked on and sent motion for transcript |
| | NC | 0.2 | 12/20/2007 | Wysong | Debra | motion for transcript drafting/researching |
| | NC | 0.2 | 12/27/2007 | Wysong | Debra | problem with transcript motion the hearing officer cannot open it.  Resending it via email to see if it is just a bad attachment.  Email office IT to see if they have any ideas on how to get vm open |
| | NC | 0.2 | 1/2/2008 | Wysong | Debra | emails re transcript motion and having kh send it and fax it to the hearing officer |
| | | 1.5 | 1/4/2008 | Wysong | Debra | hearing prep Lapaari questions |
| | | 0.1 | 1/6/2008 | Shapiro | Rachel | read CPS' response to motion for transcript |
| | | 0.2 | 1/7/2008 | Contreras | Daniel | w/RLS re closing brief |
| | | 0.3 | 1/7/2008 | Pribyl | Olga | discuss with Rachel updates and closing for hearing. Discuss hearing officer's order. Discuss remaining witnesses. |

**Detailed Time Record for 2007-1431/Walls page 20**

| | | | | | | |
|---|---|---|---|---|---|---|
| | | 3.4 | 1/7/2008 | Shapiro | Rachel | 2.5 worked on proposed statement of fact, .1 discussed case with OP re closing.4 spoke with Petrina and Buford (probation), .2 spoke with DW re Dr. Ferre's bill, .2 discussed closing brief with DC |
| | | 0.1 | 1/7/2008 | Wysong | Debra | email re hearing prep and Lapaari |
| | NC | 0.3 | 1/7/2008 | Wysong | Debra | .2 t/c rls Ferre's bill .1 emailing Ferre sending draft to RLS first then email to Dr. Ferre |
| | | 2 | 1/8/2008 | Shapiro | Rachel | .8 worked on statement of facts,.4 talked to DJW re statement of facts, .4 talked to DJW re closing and .2 talked to DJW re transcript motion, .2 talked to field Probation officer re court hearing today and re due process |
| | | 0.1 | 1/8/2008 | Wysong | Debra | email re hearing |
| | | 0.3 | 1/8/2008 | Wysong | Debra | closing brief ideas |
| | | 0.3 | 1/8/2008 | Wysong | Debra | emailing FAPE argument from another case - found and emld to RLS |
| | | 1 | 1/8/2008 | Wysong | Debra | .2 confs RLS re transcript motion, hearing officer decision on motion - we won, .4 closing, ..4 statement of facts |
| | | 1.4 | 1/9/2008 | Shapiro | Rachel | case law research for closing and for hearing officer's request re compensatory education |
| | | 0.1 | 1/9/2008 | Wysong | Debra | hearing prep |
| | | 0.1 | 1/9/2008 | Wysong | Debra | notes on case |
| | | 0.3 | 1/9/2008 | Wysong | Debra | drafting direct for Lapaari |
| | | 3.7 | 1/10/2008 | Shapiro | Rachel | 1.4 went through case law for FAPE, 1.3 began working on closing argument, 1.0 wrote some questions for Laaperi's direct |
| | | 0.2 | 1/10/2008 | Wysong | Debra | eml from and reply Dr. ferre re bill, rls re lapaari questions and plan for prep |
| | | 0.4 | 1/10/2008 | Wysong | Debra | drafting closing |

**Detailed Time Record for 2007-1431/Walls page 21**

| | | | | | | |
|---|---|---|---|---|---|---|
| | | 5 | 1/11/2008 | Shapiro | Rachel | 1.3 spoke with Dr. Laaperi re her testimony, .4 discussed closing and Laaperi prep with DJW, .6 worked on Laaperi's questions,2.7 worked on closing argument |
| | | 0.4 | 1/11/2008 | Wysong | Debra | t/c rls to discuss prep of Lapaari for direct and discussing closing |
| | | 1.3 | 1/11/2008 | Wysong | Debra | prepping Dr. Lapaari w/ rls |
| | | 3.1 | 1/12/2008 | Wysong | Debra | Dr. Lapaari reviewing her report drafting questions, drafting closing argument |
| | | 1.9 | 1/13/2008 | Wysong | Debra | dr. Lapaari drafting questions from 35 page report |
| | | 6.9 | 1/14/2008 | Shapiro | Rachel | 6.3 worked on closing, .3 discussed closing with DJW, .3 discussed Laaperi's directs with DJW |
| | | 1.1 | 1/14/2008 | Wakelin | Margie | Refreshed and revised direct of reading specialist; reviewed notes for attendance officer direct to determine questions on re-direct |
| | | 0.75 | 1/14/2008 | Wakelin | Margie | Met with EFE staff (Rachel & DJW) to discuss new goals for attendance officer and direct of reading specialist |
| | | 0.1 | 1/14/2008 | Wysong | Debra | springer questions drafting direct |
| | | 0.3 | 1/14/2008 | Wysong | Debra | conf rls re closing |
| | | 0.1 | 1/14/2008 | Wysong | Debra | eml re W hearing |
| | | 0.3 | 1/14/2008 | Wysong | Debra | conf RLS re Dr. Lapaari direct |
| | | 2.5 | 1/14/2008 | Wysong | Debra | lapaari drafting questions for direct |
| | | 1 | 1/15/2008 | Pribyl | Olga | meet with Rachel, and meet with Rachel and DJW to discuss last two days of hearing, witness questions, and closing. |

**Detailed Time Record for 2007-1431/Walls page 22**

| | | | | | | |
|---|---|---|---|---|---|---|
| | | 5 | 1/15/2008 | Shapiro | Rachel | 1.7 worked on closing, 2.0 conference w/DJW drafting closing and discussing hearing prep for closing and final witnesses, 1.0 discussed closing and final witness questions with DJW and OP, .3 spoke with PO re attendance contract and reenrollment |
| | | 0.7 | 1/15/2008 | Wysong | Debra | lapaari hearing prep |
| | | 1 | 1/15/2008 | Wysong | Debra | t/c RLS re Karen Wardlaw rebuttal witness , meeting with OP&RLS re closing and witness questions |
| | | 2 | 1/15/2008 | Wysong | Debra | conf RLS drafting closing and discussing hearing prep issues |
| | | 2.6 | 1/15/2008 | Wysong | Debra | hearing prep: Lapaari |
| | | 2.8 | 1/16/2008 | Pribyl | Olga | .9several conferences with Rachel, DJW and .2Margie re questions about tomorrow's hearing. Review and make changes to findings of fact. |
| | | 4.9 | 1/16/2008 | Shapiro | Rachel | .9 spoke with OP, MW (part of time), and DW multiple times regarding various directs, strategies, closing, and statement of proposed facts; .5 worked with DJW on some of Laaperi's direct; 2.0 worked on closing brief; 1.5 worked on statement of facts |
| | | 1 | 1/16/2008 | Wakelin | Margie | .8 Finished revising direct and prepped for hearing, .2 meet w/ deb and olga, and rls re witenss questions and closing |
| | | 0.2 | 1/16/2008 | Wysong | Debra | dr. lapaari drafting questions |
| | | 0.9 | 1/16/2008 | Wysong | Debra | conf rls, mw (for part of the conf), op  re directs strategies and proposed findings of fact |
| | | 0.5 | 1/16/2008 | Wysong | Debra | conf rls re hearing- discussing Dr. Lapaari direct |
| | | 1.2 | 1/16/2008 | Wysong | Debra | prep for W hearing dr. lapaari direct, proposed order drafting ideas |
| | | 2 | 1/16/2008 | Wysong | Debra | drafting questions for witnesses |

**Detailed Time Record for 2007-1431/Walls page 23**

| | NC | 10 | 1/17/2008 | Contreras | Daniel | attended, observed due process hearing |
|---|---|---|---|---|---|---|
| | | 9.2 | 1/17/2008 | Pribyl | Olga | travel to and from hearing. Attend hearing. |
| | NC | 9.8 | 1/17/2008 | Shapiro | Rachel | due process hearing |
| | | 4 | 1/17/2008 | Wakelin | Margie | Hearing: Finished Direct of Attendance Officer; conducted direct of Reading Specialist |
| | | 0.9 | 1/17/2008 | Wysong | Debra | drafting questions for barb rezabek |
| | | 1.3 | 1/17/2008 | Wysong | Debra | drafting questions gary wittbrodt reveiwing email and drafting questions |
| | NC 4 | 10 | 1/17/2008 | Wysong | Debra | due process hearing |
| | | 9.6 | 1/18/2008 | Pribyl | Olga | calls to Tracy ham and office. attend hearing. Conf with probation witness.review questions for our expert, dr. laapari. Attend hearing, assign Brandon research project |
| | | 0.2 | 1/18/2008 | Shapiro | Rachel | reviewed emails re hearing today |
| | | 0.3 | 1/18/2008 | Wysong | Debra | confs w/ various staff re hearing |
| | | 2.3 | 1/18/2008 | Wysong | Debra | drafting questions for witnesses |
| | | 9.1 | 1/18/2008 | Wysong | Debra | due process hearing Dr. Lapaari, rebuttal witness, and speech therapist |
| | NC | 0.4 | 1/19/2008 | Wysong | Debra | emls update on hearing |
| | NC | 0.8 | 1/19/2008 | Wysong | Debra | hearing debriefing addressing issues to finish case |
| | NC | 0.2 | 1/22/2008 | Contreras | Daniel | w/DJW re the last day of the W's hearing |
| | | 1.3 | 1/22/2008 | Pribyl | OP | review notes on dr. laaperi's testimony for inclusion in closing and statement of facts. Emails on statement of facts and closing. |
| | | 1.1 | 1/22/2008 | Shapiro | Rachel | .4 worked on admitted document list that hearing officer wants, .4 t/c DJW re hearing officer's request for admitted document list and about witness testimony, .3 t/c DJW re Dr. Laaperi hearing prep |
| | NC | 0.2 | 1/22/2008 | Wysong | Debra | conf dc re hearing update |

**Detailed Time Record for 2007-1431/Walls page 24**

| | | | | | | |
|---|---|---|---|---|---|---|
| | | 0.3 | 1/22/2008 | Wysong | Debra | emls re hearing, scheduling, research assignments |
| | | 0.4 | 1/22/2008 | Wysong | Debra | t/c rls re hearing update from Friday testimony and hearing officer requests |
| | | 0.6 | 1/22/2008 | Wysong | Debra | .3 W notes, .3 conf rls t/ lapaari re hearing prep |
| | | 2.1 | 1/23/2008 | Shapiro | Rachel | worked on statement of facts, and looked through hearing officer's list of documents that are included in evidence to make sure we agreed |
| | | 4.2 | 1/24/2008 | Pribyl | Olga | assign research.several emails back and forth re closing/statement of fact.rev my notes on dr. laaperi for inclusion into closing.1.5 clarify with rachel and deb re closing and Dr. Lapaari testimony and rebuttal wittnesses.revise statement of facts, closing argument and motion re rebuttal witness and statute of limitations. |
| | | 5.4 | 1/24/2008 | Shapiro | Rachel | 1.5 discussed closing, Dr. Laaperi's direct, and rebuttal witness direct with OP and DW, 1.0 worked w/intern re research on comp ed that hearing officer requested, 2.5 worked on closing, .4 statement of facts, and other issues |
| | | 9.5 | 1/24/2008 | Wysong | Debra | Hearing prep: last day of hearing tomorrow - drafting closing, editing reviewing answers to research questions for hearing officer, 1.5 conf rls ,OP discussed closing, rebutal witness' direct and Dr. Lapaari's direct, |
| | | 2.8 | 1/25/2008 | Pribyl | Olga | attend last day of hearing.talk to DJW about Tracy's closing. |
| | NC | 0.4 | 1/25/2008 | Shapiro | Rachel | talked with DJW re closing |
| | | 2.4 | 1/25/2008 | Wysong | Debra | .4 t/c w/ rls hearing, discussing remaining tasks to be completed - 2.0 editing closing to reflect what was delivered at hearing and to provide to hearing officer |

Detailed Time Record for 2007-1431/Walls page 25

|  |  |  |  |  |  |  |
|---|---|---|---|---|---|---|
|  |  | 3.2 | 1/25/2008 | Wysong | Debra | drafting closing, prep for hearing |
|  |  | 5.1 | 1/25/2008 | Wysong | Debra | Hearing and document review of admitted docs w/ hearing officer and cps atty after hearing conf OP re cps closing |
|  |  | 3.3 | 1/28/2008 | Pribyl | Olga | emails back and forth on iho's email for certain research.1.3con w/Rachel re what happened and strategy.review Tracy's closing argument..1calls to DJW  re iho questions.emails to Brandon & con w/ him re research on compensatory ed.review his research.email iho. |
|  |  | 3.8 | 1/28/2008 | Shapiro | Rachel | 1.5 comp ed issues researched, 1.0 closing argument issues, 1.3 spoke with OP about all of these issues, spoke with intern re comp ed issues, emails to hearing officer and CPS |
|  | NC | 0.1 | 1/28/2008 | Wysong | Debra | t/c OP re hearing officer's questions |
|  |  | 0.6 | 1/29/2008 | Pribyl | Olga | emails from ho and Tracy re additional authority. Draft response and .1 discuss with Rachel. |
|  | NC | 0.2 | 1/29/2008 | Shapiro | Rachel | .1 email to hearing officer re comp ed, .1 discussed comp ed issues with OP |
|  |  | 0.2 | 1/30/2008 | Shapiro | Rachel | .1 talked to Toomey Reporting, .1 talked to Buford (probation officer) |
|  | NC | 0.1 | 1/31/2008 | Shapiro | Rachel | talked to DJW re court reporting |
|  | NC | 0.2 | 1/31/2008 | Wysong | Debra | t/c r/tc - re court reporter Patricial Smith re transcript what EFE wants - reg and electronic if okay cps is paying for it, .1 t/c RLS re call with reporting services |
|  | NC | 0.3 | 2/4/2008 | Shapiro | Rachel | .1 discussed court reporting issue with DJW, .2 request for clarification |
|  | NC | 0.1 | 2/4/2008 | Wysong | Debra | t/c rls re transcript not here yet - decision due today |
|  | NC | 0.4 | 2/5/2008 | Contreras | Daniel | w/RLS discussing the hearing officer's decision |

**Detailed Time Record for 2007-1431/Walls page 26**

| | | | | | | |
|---|---|---|---|---|---|---|
| | NC 0.4 | 2.3 | 2/5/2008 | Shapiro | Rachel | 1.9 reviewed decision by hearing officer,.4 discussed decision w/DC |
| | NC | 0.3 | 2/6/2008 | Contreras | Daniel | w/DJW re the hearing officer's decision and Petrina's options |
| | | 1.6 | 2/6/2008 | Shapiro | Rachel | .9 discussed decision with DJW, .7 began working on clarification request |
| | NC | 0.2 | 2/6/2008 | Wysong | Debra | faxing closing to court reporter per her request |
| | | 0.2 | 2/6/2008 | Wysong | Debra | conf re hearing officer decision and EFE's options |
| | | 1.2 | 2/6/2008 | Wysong | Debra | .3 daniel re W decision, .9 conf rls re decision, PW's options, response |
| | NC | 0.8 | 2/7/2008 | Contreras | Daniel | w/RLS and OP discussing the request for clarification |
| | | 2.1 | 2/7/2008 | Pribyl | Olga | read hearing officer's decision..8 discuss clarification request with Rachel and Daniel. emails to Barry and Laura re decision and request for clarification.look at some of cases on issues that need to be addressed. |
| | NC | 3 | 2/7/2008 | Shapiro | Rachel | 2.2 worked on clarification request,.8 discussed request for clarification w/OP and DC |
| | NC | 0.9 | 2/7/2008 | Wysong | Debra | request for clarification |
| | NC | 4.5 | 2/8/2008 | Pribyl | Olga | numerous emails and discussions re request for clarification and what to put in it. Review and revise the same.look at cases on comp ed. |
| | NC | 0.8 | 2/8/2008 | Shapiro | Rachel | .5 talked to DJW re request for clarification, .3 emailed with OP and DJW re same |
| | NC | 0.1 | 2/8/2008 | Wysong | Debra | tvmf: Rhode Island P&A re comp ed issue on NDRN and r/tvm re: comp ed issue req. brief that was offered |
| | NC | 0.3 | 2/8/2008 | Wysong | Debra | affirmative defense research |
| | NC | 0.3 | 2/8/2008 | Wysong | Debra | eml re W compe ed brief P&A |

**Detailed Time Record for 2007-1431/Walls page 27**

|  | NC | 0.5 | 2/8/2008 | Wysong | Debra | t/c RLS re comp ed issue in request for clarification |
|---|---|---|---|---|---|---|
|  | NC | 1.6 | 2/8/2008 | Wysong | Debra | working on request for clarification |
|  | NC | 0.1 | 2/10/2008 | Shapiro | Rachel | emails with OP/DJW re request for clarification |
|  | NC | 2.4 | 2/11/2008 | Pribyl | Olga | finalize request for clarification. Take out section. Discuss changes with DJW. Forward to hearing officer, Tracy and isbe. |
|  | NC | 0.5 | 2/11/2008 | Shapiro | Rachel | spoke with DJW and OP re request for clarification, spoke with DJW re IEP for Petrina |
|  | NC | 0.5 | 2/11/2008 | Wysong | Debra | t/c rls and op re request for clarification |
|  |  | 0.1 | 2/11/2008 | Wysong | Debra | emlf and reply rls re IEP scheduling |
|  |  | 0.1 | 2/11/2008 | Wysong | Debra | emlf tracy re IEP |
|  | NC | 0.1 | 2/11/2008 | Wysong | Debra | emls re clarification |
|  | NC | 0.3 | 2/11/2008 | Wysong | Debra | conf OP re W discussing affirmative defenses, research for request for clarification |
|  | NC | 0.9 | 2/11/2008 | Wysong | Debra | tcf: karen and eml re request for clarification, |
|  |  | 0.2 | 2/13/2008 | Shapiro | Rachel | .2 discussed IEP plans with DJW, left vm for field PO re attendance, spoke with probation re IEP date and discussed this with DJW |
|  |  | 0.1 | 2/13/2008 | Wysong | Debra | conf re IEP meeting Feb 22nd |
|  | NC | 0.2 | 2/14/2008 | Pribyl | Olga | review cps response to request for clarification. |
|  | NC | 0.1 | 2/14/2008 | Shapiro | Rachel | discussed request for clarification with DJW |
|  | NC | 0.1 | 2/14/2008 | Wysong | Debra | t/c rls re request for clarification |
|  | NC | 0.9 | 2/15/2008 | Shapiro | Rachel | .2 read through comp ed memo by Brandon, .7 cleaned out all the files and stored the docs/files/etc in a storage cabinet |
|  |  | 0.3 | 2/18/2008 | Shapiro | Rachel | .1 spoke with P re IEP Friday, .2 sent letter with info re IEP to P |
|  |  | 2.3 | 2/19/2008 | Pribyl | Olga | review research and cases on comp ed issue |
|  |  | 0.2 | 2/20/2008 | Shapiro | Rachel | .1 reviewed hearing officer's clarification decision, .1 spoke with Acacia re attendance |
|  |  | 0.2 | 2/21/2008 | Pribyl | Olga | discussion of decision and options |

**Detailed Time Record for 2007-1431/Walls page 28**

| | | | | | | |
|---|---|---|---|---|---|---|
| | | 1 | 2/21/2008 | Shapiro | Rachel | .6 IEP prep, .2 left vm for Buford and P, .2 logistics with DJW for IEP (ordered by hearing officer) tomorrow |
| | | 1.3 | 2/21/2008 | Wysong | Debra | 1.1 re W prep for appeal, .2 conf rachel re logistics for IHO ordered IEP meeting tomorrow |
| | | 5.5 | 2/22/2008 | Shapiro | Rachel | IEP meeting ordered by Hearing officer, travel, notes in document management system |
| | | 7.9 | 2/22/2008 | Wysong | Debra | IHO ordered IEP meeting with Rachel travel included |
| | | | | | | |
| | | | | | | |
| Fees | Rates | Time Totals | | Last name | First Name | |
| 35295 | 325 | 108.6 | | Pribyl | Olga | |
| 49122.5 | 175 | 280.7 | | Shapiro | Rachel | |
| 35650 | 250 | 142.6 | | Wysong | Debra | |
| 7577.5 | 175 | 43.3 | | Contreras | Daniel | |
| 2542.5 | 150 | 16.95 | | Wakelin | Margie | |
| | | | | | | |
| 130187.5 | | | | **TOTAL** | | |

**Detailed Time Record for 2007-1431/Walls page 29**

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |

**Detailed Time Record for 2007-1431/Walls page 30**

|  |  |  |  |  |  |  |  |
|--|--|--|--|--|--|--|--|
|  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |

**Detailed Time Record for 2007-1431/Walls page 31**

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |

**Detailed Time Record for 2007-1431/Walls page 32**

|  |  |  |  |  |  |  |  |
|--|--|--|--|--|--|--|--|
|  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |

**Detailed Time Record for 2007-1431/Walls page 33**

|  |  |  |  |  |  |  |  |
|---|---|---|---|---|---|---|---|
|  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |

**Detailed Time Record for 2007-1431/Walls page 34**

|  |  |  |  |  |  |  |  |
|---|---|---|---|---|---|---|---|
|  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |

**Detailed Time Record for 2007-1431/Walls page 35**

**Detailed Time Record for 2007-1431/Walls page 36**

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |

**Detailed Time Record for 2007-1431/Walls page 37**

|  |  |  |  |  |  |  |  |
|--|--|--|--|--|--|--|--|
|  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |

**Detailed Time Record for 2007-1431/Walls page 38**

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |

**Detailed Time Record for 2007-1431/Walls page 39**

|  |  |  |  |  |  |  |  |
|--|--|--|--|--|--|--|--|
|  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |

Detailed Time Record for 2007-1431/Walls page 40

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |

**Detailed Time Record for 2007-1431/Walls page 41**

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| | | | | | | | |
| | | | and Attendance Officer, .5 conf rls re direct | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |

Detailed Time Record for 2007-1431/Walls page 42

**Detailed Time Record for 2007-1431/Walls page 43**

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |

**Detailed Time Record for 2007-1431/Walls page 44**

|  |  |  |  |  |  |  |  |
|---|---|---|---|---|---|---|---|
|  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |

**Detailed Time Record for 2007-1431/Walls page 45**

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |

**Detailed Time Record for 2007-1431/Walls page 46**

|  |  |  |  |  |  |  |  |
|--|--|--|--|--|--|--|--|
|  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |

**Detailed Time Record for 2007-1431/Walls page 47**

|  |  |  |  |  |  |  |  |
|--|--|--|--|--|--|--|--|
|  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |

**Detailed Time Record for 2007-1431/Walls page 48**

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |

**Detailed Time Record for 2007-1431/Walls page 49**

|  |  |  |  |  |  |  |  |
|--|--|--|--|--|--|--|--|
|  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |

**Detailed Time Record for 2007-1431/Walls page 50**

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |

Detailed Time Record for 2007-1431/Walls page 51

|  |  |  |  |  |  |  |  |
|--|--|--|--|--|--|--|--|
|  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |

Detailed Time Record for 2007-1431/Walls page 52

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |

**Detailed Time Record for 2007-1431/Walls page 53**

|  |  |  |  |  |  |  |  |
|--|--|--|--|--|--|--|--|
|  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |

**Detailed Time Record for 2007-1431/Walls page 54**

|  |  |  |  |  |  |  |  |
|--|--|--|--|--|--|--|--|
|  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |

**Detailed Time Record for 2007-1431/Walls page 55**

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |

**Detailed Time Record for 2007-1431/Walls page 56**

|  |  |  |  |  |  |  |  |
|--|--|--|--|--|--|--|--|
|  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |